FOURTH DIVISION

No. 1-09-3328 and 1-09-3451 (consolidated)

| | | |
|---|---|---|
| *In Re* ESTATE OF MARGERY M. ELIAS, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Margaret K.H. Whitaker, as Independent Executor of the Estate of Margery M. Elias, Deceased, | ) ) ) | |
| Petitioner-Appellee and Cross-Appellant, | ) ) | 07 P 6699 |
| v. | ) ) | |
| | ) | The Honorable |
| Eleanor A.H. McDonnell, | ) | James W. Kennedy, |
| | ) | Judge Presiding. |
| Respondent-Appellant and Cross-Appellee, | ) ) | |

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.

Presiding Justice Gallagher and Justice Lavin concurred in the judgment and opinion.

## OPINION

Petitioner-appellee and cross-appellant, Margaret A.H. Whitaker, independent executor of the estate of Margery M. Elias, deceased, filed a petition for recovery of citation against respondent-appellant and cross-appellee, Eleanor A.H. McDonnell, to recover personal property and approximately $471,000 which was transferred from Elias's brokerage account to McDonnell pursuant to a transfer-on-death beneficiary form Elias executed while McDonnell was acting under a power of attorney. The trial court found that Elias lacked mental capacity to effect the transfer of money and gifts of personal property. The trial court also found that there was a presumption these transfers were fraudulent because McDonnell was appointed Elias's power of

attorney, and that McDonnell failed to rebut this presumption. The court awarded Whitaker her fees and costs as executor, but assessed all fees and costs against the estate. Both appealed. McDonnell seeks to have the judgment reversed. Whitaker seeks to have the fees and costs assessed entirely against McDonnell. We find the trial court's determination of lack of testamentary capacity and use of undue influence was not against the manifest weight of the evidence and affirm that judgment. We also affirm the portion of the fee order awarding the total amount of attorney fees and costs. However, the trial court abused its discretion in not equitably apportioning the fees and costs between the estate and McDonnell, and thus, we reverse that portion of the order and remand for a determination of the fees and costs incurred as a result of the misconduct of McDonnell and order that this portion of fees and costs be assessed against her.

## BACKGROUND

The following facts were adduced at trial in the citation proceedings.

Elias executed a will on September 14, 1997, and two codicils, one on January 21, 1988, and another on February 10, 1995. The will left $5,000 to Elias' son, Ramon J. Elias, Jr. (Jay), with the balance of her estate split equally between McDonnell and Whitaker. McDonnell and Whitaker are both daughters of the late Elias. The January 21, 1988, codicil named as executors Elias' husband, followed by Whitaker, then in succession McDonnell, William A. Edwards, and Society National Bank. The second codicil dated February 1, 1995, only amended the first paragraph of the will to reflect that all jewelry would be split equally between McDonnell and Whitaker, and did not amend any other will provision.

Elias and her husband, Ramon Elias, had a 45-acre farm property and residence in Ohio.

2

Ramon Elias died in March 2004. Whitaker testified that before her father died, she would visit on holidays and at other unscheduled times, but the only time the whole family got together was for her father's funeral. The family had a history of friction, including the disowning of Whitaker and McDonnell's brother Jay about 30 years ago, and there was always friction between Whitaker and McDonnell.

Elias decided to sell the farm after her husband died. There were frequent telephone calls among Elias, McDonnell and Whitaker regarding where Elias would live. Elias eventually moved into an apartment in Mayfield, Ohio, in March 2005.

After the farm was sold in August 2005, McDonnell and Whitaker both spent four weekends in October 2005 helping Elias pack up the items in the house. Whitaker testified that Elias was "wandering" and was not packing, but McDonnell testified that Elias was doing loads of laundry, making meals for everyone, cleaning and organizing the packing, and assisting in the moving process.

On the second weekend, Whitaker and McDonnell were sorting items for packing when Elias screamed that one of the paintings, either a Picasso or a Rembrandt, was missing. McDonnell accused Whitaker of taking it and said that either Whitaker or their brother Jay must have it. Whitaker stated that was not possible because she arrived on Friday night at 9 p.m., after McDonnell arrived, and left Sunday night, while McDonnell left Monday morning, and McDonnell had the key. McDonnell tackled Whitaker in the atrium as Whitaker tried to leave to take a break, and Elias told the two of them to stop.

On the third weekend, Whitaker arrived at the farm at around 9 p.m. as usual, but the

house was locked and dark. Elias and McDonnell arrived at 11:30 p.m. and went inside and hung up their coats. Whitaker followed them inside and stated, "You two are the two most self-centered women that I have ever known in my life," because neither had called Whitaker to let her know they would be running late. At that point, Elias slapped Whitaker. Whitaker in turn touched Elias, and Elias lost her balance and stepped back but did not fall. McDonnell did not witness this altercation. Also, McDonnell never witnessed Whitaker strike Elias at any time. Whitaker stayed overnight and proceeded to continue assisting in packing that weekend, speaking with her mother about the order of packing items. Elias was still wandering around the house. On the final weekend, moving trucks moved all the personal property they had packed into four storage units in Mayfield Heights, down the street from Elias' apartment.

The only items gifted to McDonnell by Elias were a baby grand piano, some cabinets, books, and two chandeliers. Whitaker was given the player piano, a small marble end table, some books and two chandeliers, because, according to Whitaker, it was an even split. Other than the items Elias took to her new apartment, all remaining personal property went into storage. Whitaker testified that McDonnell took other personal property of Elias, while McDonnell testified that she was given the items by Elias, including a gold ring, blue lamp, and flatware. As to particular items, Whitaker's and McDonnell's valuations varied substantially. In particular, the flatware given to McDonnell is alleged by Whitaker to be worth up to $200,000, but McDonnell's appraiser placed the value of the flatware at approximately $14,050. McDonnell's appraiser further appraised the contested personal property in possession of McDonnell at $31,000, and the personal property of the Estate in storage at $45,000.

Witness Cosette Gaul helped Elias do work on the farm while Elias owned the farm and had many conversations with her during 2004 to 2005, which continued by phone one to two times a week after the farm was packed up, into 2006. Gaul testified that in all these conversations, Elias was of sound mind and memory. Gaul was present on one of the weekends when Whitaker and McDonnell were helping Elias pack up the house and observed Whitaker swearing and being rude to everyone including Elias. Gaul testified that "Eleanor [McDonnell] seemed to be there for her mother. I wouldn't say Maggie [Whitaker] was."

Ann Lax testified that she had known the Eliases for 50 years. While Elias was living on the farm, Lax saw her in person once a month and spoke with her one to two times a week. After Ramon Elias died, Lax spoke with Elias by telephone approximately three times a week. After Elias moved to Mayfield Heights in August 2004, Lax saw her in person four times a month and spoke with her on the telephone one to two times a week. Lax testified that Elias seemed normal and of sound mind and memory.

Whitaker visited Elias in person at least once a month after her father's death and before Elias moved from the farm to the apartment. Prior to her father's death, Whitaker recalled her mother's personality as "very, very strong-willed" and "very, very independent." She loved doing activities, going to a movie or the symphony or the ballet, and she traveled. She also organized dinners, cocktail parties, and gatherings and was very organized. Whitaker testified that Elias became confused and very depressed after her husband died and had trouble remembering things.

Elias had several car accidents, one of which resulted in the total loss of her vehicle. Whitaker arranged for the purchase of a new vehicle. However, six months later Elias called

Whitaker to tell her the car was getting repossessed and that the dealer made a mistake with the paperwork. Elias had decided to put the insurance money from the accident in her account, instead of paying the car in full, and executed a 60-month note. The dealer had given her a coupon book for her payments, but Elias told Whitaker she never received a coupon book and was not aware that she had a note on the vehicle. Elias also indicated she was having trouble balancing her checkbook. Whitaker discussed the issue with McDonnell and they decided that Elias' broker, John Turner, would assist her with paying her bills and balancing her checkbook. Elias was advised to pay for the vehicle in full and so she kept it.

There was also an incident where Elias struck a vehicle in 2005 in a shopping mall parking lot and did not remember doing so. She called Whitaker to complain that she thought she was being involved in insurance fraud. Whitaker informed McDonnell of this incident.

Whitaker was concerned about Elias and wrote a letter to Elias' primary physician, Dr. Thomas King, in March 2005 outlining her concerns and Dr. King saw Elias. Elias told Whitaker that Dr. King gave her a clean bill of health, but Whitaker did not believe Elias.

Whitaker spoke with McDonnell and McDonnell indicated that she had some of the same concerns. They discussed that Elias had gotten lost on the way to a restaurant that she had been going to for 45 years. McDonnell indicated she would research and find a better doctor for Elias to ascertain whether Elias had a confusion problem, a depression problem, or a hearing problem. According to McDonnell, Dr. King called her and told her he thought Elias was depressed, but that otherwise she was fine.

McDonnell testified that she had frequent contact with her mother after her father died,

including in-person visits at least one week every month. McDonnell also had phone contact with Elias two to three times per week.

Elias executed a health care power of attorney on September 28, 2005, naming McDonnell, with Whitaker as successor. On that same date, Elias executed a durable general power of attorney appointing Whitaker as her power of attorney. However, on November 16, 2005, Elias executed another durable general power of attorney instead naming McDonnell, with Whitaker as successor. The durable power of attorney granted broad powers to McDonnell to handle and dispose of Elias' real and personal property.

According to McDonnell, she did not invoke her power of attorney because Elias gave her permission to talk to her doctors. However, on February 20, 2006, McDonnell sent a fax to Dr. King asking to "have my mother sign consent for me to be able to assist you regarding her matters," and indicating she had previously faxed the signature page of her health care power of attorney executed September 28, 2005.

McDonnell moved Elias to Illinois initially for testing, and then moved her there permanently. According to McDonnell, in December 23, 2005, she took Elias to Alexian Brothers Hospital in Elk Grove Village, Illinois, because she was still attempting at that time to get Elias into an assisted living facility in Cleveland where Elias wanted to go but Dr. King was not cooperating. It was more convenient for McDonnell to take Elias to doctors in Illinois as opposed to Ohio. McDonnell did not look into any other doctors for Elias in the Cleveland area.

McDonnell was not concerned with Elias' mental capacity; rather, she wanted to investigate whether Elias had a hearing problem. However, McDonnell did not make any

appointments for an ear, nose and throat specialist. McDonnell was aware that the doctor at Alexian Brothers Hospital, Dr. Forchetti, specialized in treating patients with memory problems who had Alzheimer's and dementia, but claimed dementia was "never" a concern of hers.

Whitaker was unaware that McDonnell took Elias to Alexian Brothers Hospital in Illinois, and none of the evaluations or test results were shared with Whitaker. According to McDonnell, she was acting as Elias' "sole sounding board" within the family because "[t]hat's the way [Elias] wanted it." Elias specifically informed McDonnell that she did not want Whitaker or their brother Jay to know anything about her life.

Whitaker found out that McDonnell was moving Elias to Barrington from her brother Jay. McDonnell had left a voicemail for Jay stating that Elias was moving to Chicago and if he wanted to see Elias he should have lunch with them in Cleveland. Whitaker decided to go as well, even though McDonnell did not invite her, and drove 3 1/2 hours from Dayton to Cleveland. McDonnell told Whitaker and Jay that she had a power of attorney, that she was the one in control of making business decisions for Elias, and if Whitaker or Jay wanted to know anything about Elias, they were to call McDonnell and not Elias.

Whitaker was "in shock." Previously, Elias had been adamant about staying in Cleveland because she had been there for 50 years and had a social circle of friends there. At no time in 2006 did Elias ever express to Whitaker that she wished to move from the Cleveland area. According to McDonnell, however, Elias had no objection to moving to Illinois and was looking forward to it as a new "adventure," and knew many of McDonnell's friends. McDonnell also claimed that at the lunch, both Whitaker and Jay seemed "relieved" that McDonnell was taking

8

Elias with her.

After the lunch, McDonnell left with Elias and drove her to Chicago. Whitaker consulted an attorney about McDonnell's power of attorney and moving Elias to Illinois, but the attorney told her once the power of attorney was in place, there was nothing Whitaker could do. McDonnell denied making these statements and claimed Whitaker and Jay perhaps "misunderstood" what she said.

At Alexian Brothers Hospital, Michelle SanFilippo, a physician assistant, worked for Dr. Forchetti. SanFilippo also directed special care units for patients with Alzheimer's and dementia and was a volunteer for the Alzheimer's Association for 10 years. SanFilippo evaluated Elias for her mini-mental status examination at Alexian Brothers on December 23, 2005. Elias came with McDonnell. Elias did not want to be at the evaluation, was angry about not living in Ohio, and was very irritated. Elias also had poor insight into the importance of paying bills. Based on this evaluation, it was recommended that Elias not live alone for safety concerns due to her memory problems, behavior and lack of insight into her problem. Elias eventually was placed and lived at Lake Barrington Woods in Illinois from June 2006 to March 2007.

Dr. Forchetti performed a mini-mental-status examination in early 2006. Forchetti has an M.D. in neurology and a Ph.D. in neuropharmacology and sees approximately 1,000 patients a year who suffer from dementia or Alzheimer's. Dr. Forchetti remembered Elias as being very resistant to evaluation. Dr. Forchetti found Elias to be suffering from mild to moderative cognitive impairment. However, according to Dr. Forchetti, even in November 2006 Elias was partially competent. Dr. Forchetti also testified that urinary tract infections can affect a patient's

cognitive function. Dr. Forchetti further testified that she and other members of her staff are trained to evaluate whether family members are acting in the best interests of the patient and that, in her opinion, McDonnell was "absolutely" acting in the best interests of Elias.

The next time Elias was evaluated at Alexian Brothers Hospital was September 12, 2006, when she was again seen by SanFilippo. At that time, Elias was already at Lake Barrington Woods, but was having behavioral issues. McDonnell told SanFilippo that Elias was wandering into other residents' rooms and did not respond well to redirection. Elias did not know the season, month, day, date, or the location of the place they were in terms of state, county, town or city, hospital or floor. SanFilippo felt Elias needed to live in a more structured environment.

SanFilippo also saw Elias for another mini-mental-state examination on March 21, 2007. On this date, Elias only knew that it was spring. Elias was unable to recall the words "apple, table, and penny." The note for this visit indicated that McDonnell moved Elias to a dementia-specific unit at another facility. McDonnell's report from that facility was that Elias often refused to eat and to take her medication. There was also a note by Dr. Forchetti:

> "Even long-term memory appears severely compromised at this time. The patient cannot tell me nothing [*sic*] of her youth, of her past in general. She recalls to have been married but cannot tell the name of her husband. She cannot name her children and does not remember exactly how many she had."

Dr. Leahy, board certified in clinical neuropsychology and clinical rehabilitative psychology, testified that the mini-mental-status exam is a very brief exam, and that none of the tests they perform are specifically designed to determine capacity to handle finances. Elias likely

had some difficulties in organizing and paying bills, but Dr. Leahy did not assess testamentary capacity. Leahy would not give an opinion regarding testamentary capacity.

Dr. Roger Weise was Elias' internal medicine and geriatric doctor at Alexian Physicians Group beginning at the time she moved to Illinois in July 2006. Weise was the medical director of Older Adult Health Care at Alexian Physicians Group and an attending physician for patients with dementia. Elias was brought to Weise by McDonnell. Dr. Weise's nurse administered a mini-mental-status test and Dr. Weise personally evaluated Elias. Elias only knew what day it was and what town she was in. Elias exhibited moderate to severe impairment. Elias needed help with instrumental activities of daily living, including managing money, managing medication, doing laundry, buying food, driving a car, getting from place to place, and performing home repairs.

A note in Dr. Weise's records dated August 1, 2006, indicated that McDonnell called and left a message that Elias was forgetting to go down to eat dinner and needed an escort and that she was not taking showers. Another message from November 21, 2006, indicated that McDonnell reported to Dr. Weise's office that Elias was wandering into other residents' apartments and used someone else's bathroom. McDonnell also reported that Elias was accusing people of stealing her belongings. Also, on January 12, 2007, McDonnell reported to Dr. Weise that Elias was naked in her apartment when the staff at Lake Barrington Woods would bring her breakfast, and went down the hall with only a nightgown on, no slippers and no robe.

However, at trial McDonnell denied making such statements and claimed they were "boilerplate verbiage" that applied to patients with memory problems. McDonnell claimed that Elias merely used to visit a resident named Betty, and Betty did not desire frequent visits

11

anymore. McDonnell also denied telling anyone at Alexian Brothers that Elias had five car accidents, claiming "that was another stock verbiage that they put in there." McDonnell remembered telling them about only three accidents. According to McDonnell, the conclusion that Elias was unable to take care of her own finances was "generic information" that "they just plug in from the computer into these various reports."

McDonnell denied that she was acting under the power of attorney. However, a copy of McDonnell's power of attorney was sent to Alexian Brothers from McDonnell's business fax machine on July 17, 2006, though she claimed she could not recall ever sending it.

During that time, Whitaker visited Elias with her friend Brenda Tutterow in October 2006. Whitaker telephoned Elias on a Sunday and stated she would come to see her on Thursday. On Tuesday night, Elias called asked Whitaker where she was and stated she was dressed up and ready to go to dinner. On Thursday, Whitaker called Elias to let her know she was running late in traffic, and Elias did not remember that she was coming.

When Whitaker arrived for her visit with Tutterow, Elias was confused as to who Tutterow was, confusing her with Whitaker's daughter, Elizabeth. Tutterow testified that she had known Elias since 1990, and saw Elias possibly four to seven times and Elias previously knew who she was. Elizabeth and Tutterow were 10 years apart in age, and there was a 75-pound physical difference between the two. Tutterow testified that Elias "did not seem like the person" she knew, was confused, and was not attentive at all, "[l]ike she wasn't there."

From June 2006 to December 2006, McDonnell visited Elias one to two times a week, including extensively on Sundays. In late June or early July 2006, McDonnell began writing out

checks for Elias, and then began also signing all of Elias' checks in January 2007. McDonnell testified that Elias was not confused, with the exception of periods when she had urinary tract infections and had some short-term memory problems as a result of those infections.

Elias executed the transfer-on-death agreement for her Linsco Private Ledger (LPL) account on August 12, 2006, naming McDonnell as the sole beneficiary and McDonnell's husband, Peter J. McDonnell, as contingent beneficiary. McDonnell testified that she was alone with Elias when she executed it. Elias did not consult with an attorney or any other advisor. Except for Elias' signature, the entirety of the document was written by McDonnell. McDonnell filled out the beneficiary information on the form, listing herself as the 100% primary beneficiary, and made no provision for Elias' other children, Whitaker and Jay. According to McDonnell, Turner sent her the transfer-on-death document and asked her if she would have Elias sign it. McDonnell told Elias that Elias' broker, John Turner, wanted Elias to fill out the form. McDonnell showed Elias where to sign the form, and she signed.

In April 2007, Whitaker discovered that Elias was moved from Lake Barrington Woods because she had broken her hip, had hip replacement surgery, and was in the hospital. McDonnell had not informed her. Whitaker wanted to visit Elias the following week, but McDonnell objected because she would be out of town. McDonnell then instituted a password protection system whereby no one could speak with Elias unless they knew the password. In May 2007, Whitaker telephoned the hospital to wish Elias a happy Mother's Day, but was told that she could not speak with Elias unless she had the password. McDonnell informed Whitaker that she instituted the password because Elias was not ready to talk to Whitaker yet, and she had the

power of attorney. McDonnell further refused to give Whitaker Elias' address. McDonnell claimed she instituted the password because she was "protecting" Elias' safety and "encouraging her fast recovery." According to McDonnell, after the "abuse" at the farm, Elias "did not feel safe in the presence of" Whitaker and Elias requested not to be alone with Whitaker. According to McDonnell, Elias stated she did not want to ever be alone with Whitaker. McDonnell claimed at trial that "it turns out" Whitaker had been verbally abusing Elias for "years."

Although McDonnell claimed that she first acted pursuant to the general durable power of attorney on April 2, 2007, when Elias broke her hip, checks written by McDonnell dated August 31, 2006, September 1, 2006, September 11, 2006, and numerous other checks, stated "durable power of attorney," "DPOA" or "POA" on the memo line. Elias' National City Bank account was in her name only; McDonnell was not on the account. McDonnell wire-transferred $20,000 from Elias' National City Bank account to a joint account in her name and Elias' name at Barrington Bank & Trust on December 27, 2006. That joint account was opened on July 14, 2006, for "convenience" and was primarily funded with Elias' money. All the checks drawn on that account were written by McDonnell. McDonnell wrote check number 2526 dated December 30, 2006, to herself for $11,750.00, and wrote "Gift from mom." McDonnell and her husband had a tax lien that was placed on their Barrington property on April 19, 2004, in the amount of $26,650, which was released on April 19, 2007. However, McDonnell claimed she used only funds from her business to release the tax lien. On May 15, 2007, McDonnell wrote check number 1027 to herself drawn on Elias' account for $11,500. McDonnell testified that Elias told her if she ever needed money to help herself.

Though McDonnell refused Whitaker any information when Elias broke her hip, Whitaker found Elias' address in the White Pages. For six weeks, Whitaker and Jay drove to Chicago and visited Elias for three days of the week. Whitaker testified that during this time Elias was "totally cooked," oblivious to her surroundings. Elias was in a psychiatric ward because the hospital staff stated she was combative and not willing to take her medication.

Elias passed away on June 20, 2007. McDonnell faxed a copy of Elias' death certificate to LPL and on July 30, 2007, sent a request that all of the money in Elias' LPL account be transferred to McDonnell's LPL account and another bank account. McDonnell had previously faxed her durable general power of attorney to Turner on February 20, 2007. As of July 31, 2007, the amount in Elias' LPL account was $440,743.11. The amount of $398,808.19 was transferred to McDonnell's account. A further transfer of $40,000 was made from Elias' LPL account to McDonnell's personal account at Barrington Bank & Trust.

During the entire six weeks Whitaker and Jay were visiting Elias, McDonnell claimed she was the executor of Elias' estate. However, on August 28, 2007, after locating "lost legal documents," McDonnell discovered Whitaker was actually the executor and called Whitaker to notify her she was the executor and that she needed to hire an attorney because there was a conflict of interest. However, McDonnell did not provide Whitaker a copy of Elias' will at that time. Whitaker received a copy of the will after her counsel requested it.

Even after discovering the will which bequeathed the bulk of Elias' estate in equal portions to McDonnell and Whitaker, McDonnell continued to write checks using the money she had transferred from Elias' LPL brokerage account. McDonnell wrote check number 1002 from her

Barrington bank account dated August 31, 2007, payable to herself for $15,000, with a memo stating "$10,000 retainer," but McDonnell could not remember what the "retainer" was for. McDonnell wrote check number 1005 dated September 19, 2007, to her husband for $1,500, to reimburse him for clothes McDonnell had bought herself. McDonnell wrote check number 1006 dated September 26, 2007, to her husband for $3,000, also for clothes. McDonnell wrote check number 1007 dated September 26, 2007, payable to herself, for $10,000, but could not explain what that check was for. McDonnell wrote check number 1008 in the amount of $5,525.58, for landscaping at her house. McDonnell wrote check number 1012 in the amount of $3,034.96 to Macy's. McDonnell also wrote three checks totaling $50,000, payable to herself, in November 2007, and the bulk of these funds were then deposited into McDonnell's A.G. Edwards account. McDonnell did not know if she kept the remainder of these funds in cash.

Meanwhile, there were debts for Elias which remained unpaid. According to McDonnell, she was advised by her attorney not to pay the debts because there was a question whether she was the executor. There was an unpaid IRS tax bill for the year 2006 in the amount of $31,438.90. McDonnell did not set aside funds to pay those taxes because she was advised "it was going to be a wash" based on write-offs, and thus would not owe any taxes. However, a letter from the IRS stated that the amount was indeed owed.

After Whitaker became executor and received letters of office on September 14, 2007, she made an inventory list of all the items in the storage units, with the assistance of her brother Jay, and made a list of items that were missing, including missing furniture, jewelry and flatware. Because the storage units were an estate matter, the storage facility double-locked the units and

16

did not allow Whitaker to open the units without the presence of someone from the facility. Whitaker took photos of the items and did not remove anything from the storage units. Prior to Whitaker becoming executor, only Elias, McDonnell and her husband had keys and access to the storage units.

McDonnell responded to Whitaker's line-item missing pieces by stating either they were in her possession and were gifted to her, should be in storage, or she did not know where they were. McDonnell came into possession of a majority of the items she had after Elias moved to Illinois. McDonnell maintained that Elias gave her a blue lamp, gold crest ring, pearl ring, dining room table, and a highboy previously as gifts from Elias, as well as a secretary desk given to McDonnell by Elias as a gift from McDonnell's grandmother. McDonnell retained numerous items in her possession that she felt were "susceptible to theft," which were not discovered until June 9, 2008, when she brought the items to the storage units for appraisal.

After Whitaker became executor, she also learned of the outstanding debts for Elias that were not paid, that Elias' LPL brokerage account had been completely withdrawn pursuant to the transfer-on-death document naming McDonnell as the sole beneficiary, and that the combined amount of money in Elias' remaining accounts was less than $3,000. Whitaker also learned that Elias' 2006 taxes were not filed because McDonnell did not ask the accountant to file the return. Whitaker discovered that the nearly $31,000 was owed because McDonnell instructed Turner to sell some of Elias' Exxon stock in 2006 and there was a capital gain. Turner told Whitaker that McDonnell had instructed him to sell the stock because there was a margin call. However, Whitaker discovered that there was no margin call. McDonnell claims Elias sold the stock.

Subsequently, Whitaker filed a petition to recover the assets McDonnell took. At trial, Dr. Daniel Marson, a professor and director in the department of neurology and Alzheimer's Disease Research Center at the University of Alabama at Birmingham, testified as McDonnell's expert. Marson also has a law degree. Marson acknowledged that Elias lacked contractual and financial capacity, but testified that "testamentary capacity requires the lowest level of mental capacity among the financial capacities that are discussed in the law." Marson opined that Elias probably had testamentary capacity on August 12, 2006, when she executed the transfer-on-death certificate designating McDonnell as the beneficiary, and that she was probably not subject to undue influence at that time. He opined that although Elias was "clearly" suffering from Alzheimer's at this time and "was on a path of decline," she must be accorded a presumption of capacity that has to be rebutted, and neither Dr. Forchetti nor Dr. Leahy evaluated Elias' testamentary capacity. Marson did not feel there was strong evidence of loss of such historical knowledge associated with testamentary capacity until March 2007. Marson relied on the deposition testimony of Dr. Forchetti wherein Forchetti indicated her belief that McDonnell was acting in Elias' best interest, as well as the testimony of Lax.

However, in arriving at his opinion, Marson did not review the following: the medical records of Dr. King, including Whitaker's letters stating her concerns; Whitaker's deposition; and the deposition of Dr. Weise. Marson conceded that Elias missing car payments and being involved in an accident would be relevant considerations if they were related to incipient dementia, as would be Elias confusing Tuttera's daughter for her own granddaughter. Marson also conceded as relevant Dr. Leahy's note of September 12, 2006, indicating that Elias was not

aware of the place, month, day, date, or year. Marson further conceded it was relevant that when Elias went to an attorney on November 16, 2005, she made no changes to her will, but when Elias was alone with McDonnell on August 12, 2006, she executed the transfer-on-death document leaving her entire account to McDonnell. Marson conceded that it "is possible" that Elias lacked testamentary capacity, if he considered additional evidence that McDonnell was completely handling Elias' check writing and bill payments, and was assisting her with her medical treatment to the exclusion of other family members.

The trial court found that Elias lacked the mental capacity to execute the transfer-on-death form for her LPL brokerage account, and entered judgment on August 11, 1009, ordering McDonnell to return $471,750 in cash and all personal property, except for the three items she already had, to Elias' estate. On November 19, 2009, the trial court also granted Whitaker's counsel's petition for attorney's fees in the amount of $201,227.50 and costs of $33,135.85, finding that these fees and costs were fair and reasonable, but ordered that they be assessed against the estate and did not grant Whitaker's supplemental petition requesting that the fees and costs be assessed against McDonnell. Both Whitaker and McDonnell appealed.

ANALYSIS

McDonnell appeals both the order allowing attorney fees and costs, and the judgment order of August 11, 2009, finding that Elias lacked mental capacity to execute the testamentary transfer of her LPL account and that McDonnell exercised undue influence to effect a fraudulent transfer. Whitaker cross-appeals only the order assessing attorney fees out of the estate and not against McDonnell personally. We discuss the appeal of the judgment order of August 11, 2009,

19

1-09-3328 and 1-09-3451 (consolidated)

first.

I. Judgment Finding Lack of Mental Capacity and Fraudulent Transfer and Undue Influence

McDonnell appeals from the judgment of August 11, 2009, finding both lack of testamentary capacity and undue influence and seeks reversal of the order directing her to return to the estate $471,750 in cash and personal property and remand for a new trial.

In a citation proceeding, the probate court is empowered to determine the title and right of property and enter such order as the case requires. *In re Estate of Kolbinger*, 175 Ill. App. 3d 315, 322, 529 N.E.2d 823, 827 (1988). The Probate Act of 1975 (Probate Act) (755 ILCS 5/1-1 *et seq.* (West 2008)) provides, in pertinent part:

> "(a) Upon the filing of a petition therefor by the representative or by any other
> person interested in the estate or, in the case of an estate of a ward by any other person,
> the court shall order a citation to issue for the appearance before it of any person whom
> the petitioner believes (1) to have concealed, converted or embezzled or to have in his
> possession or control any personal property, books of account, papers or evidences of
> debt or title to lands which belonged to a person whose estate is being administered in that
> court or which belongs to his estate or to his representative ***.

> * * *

> (d) The court may examine the respondent on oath whether or not the petitioner
> has proved the matters alleged in the petition, may hear the evidence offered by any party,
> may determine all questions of title, claims of adverse title and the right of property and
> may enter such orders and judgment as the case requires." 755 ILCS 5/16-1(a), (d) (West

20

2008).

The objectives of a citation proceeding under the Probate Act are to obtain the return of personal property belonging to the estate but in the possession of, or being concealed by, others or to obtain information to recover estate property. *In re Estate of Kolbinger*, 175 Ill. App. 3d at 322, 529 N.E.2d at 827. To recover property in a citation proceeding, an executor must initially establish a *prima facie* case that the property at issue belongs to the decedent's estate; the burden then shifts to the respondent to prove his or her right to possession by clear and convincing evidence. *In re Estate of Casey*, 155 Ill. App. 3d 116, 121-22, 507 N.E.2d 962, 966 (1987).

In the citation proceeding, Whitaker alleged that the LPL account money belonged to Elias's estate and sought to recover the funds by setting aside the LPL account transfer-on-death executed by Elias to transfer the funds to McDonnell. Dispositions of funds in payment-on-death accounts are testamentary dispositions. *In re Estate of Gubala*, 81 Ill. App. 2d 378, 382, 225 N.E.2d 646, 649 (1967). Such a disposition is often referred to as a "will substitute," defined by section 7.1 of the Restatement as "an arrangement respecting property or contract rights that is established during the donor's life, under which (1) the right to possession or enjoyment of the property or to a contractual payment shifts outside of probate to the donee at the donor's death; and (2) substantial lifetime rights of dominion, control, possession, or enjoyment are retained by the donor." (Internal quotation marks omitted.) *Handelsman v. Handelsman*, 366 Ill. App. 3d 1122, 1130, 852 N.E.2d 862, 869 (2006) (quoting Restatement (Third) of Property §7.1 (2003)). "A will and a will substitute may coexist." *Handelsman*, 366 Ill. App. 3d at 1130, 852 N.E.2d at 869.

Grounds for invalidating a will include undue influence, lack of testamentary capacity, fraud, revocation, and ignorance of contents. *Hall v. Eaton*, 259 Ill. App. 3d 319, 321, 631 N.E.2d 805, 807 (1994). When either lack of testamentary capacity or undue influence is found, such a finding invalidates the whole instrument. *Kelley v. First State Bank of Princeton*, 81 Ill. App. 3d 402, 415, 401 N.E.2d 247, 256-57 (1980). Void gifts of personal property then fall into a general residuary bequest. *In re Estate of Brach*, 147 Ill. App. 3d 819, 821, 498 N.E.2d 661, 662 (1986); *Chicago Title & Trust Co. v. City of Waukegan*, 333 Ill. 577, 581-82, 165 N.E. 348, 350 (1929).

Under Elias' will the residue of her estate, after a bequest of $5,000 to Elias' son Jay, was to pass in equal shares to Whitaker and McDonnell. The trial court found that the LPL transfer on death was invalid because Elias lacked testamentary capacity and McDonnell wielded undue influence and ordered the LPL funds and other personal property returned to Elias' estate. A trial court's finding that certain property belongs to the estate will not be disturbed on appeal unless it is against the manifest weight of the evidence, as the trial court in such proceedings is authorized to determine all questions of title, claims of adverse title and property rights. *In re Estate of Joutsen*, 100 Ill. App. 3d 376, 380, 426 N.E.2d 942, 946 (1981).

### A. Lack of Testamentary Capacity

McDonnell argues that the trial court's determination that Elias lacked testamentary capacity is against the manifest weight of the evidence. "Since the law presumes every person sane until the contrary is proved, the burden rests on the party asserting the lack of testamentary capacity to prove it." (Internal quotation marks omitted.) *In re Estate of Barth*, 339 Ill. App. 3d

22

651, 665, 792 N.E.2d 315, 326 (2003) (quoting *Wiszowaty v. Baumgard*, 257 Ill. App. 3d 812, 816, 629 N.E.2d 624, 629 (1994)). "Testamentary capacity requires that the testator have sufficient mental ability to know and remember the natural objects of her bounty, to comprehend the kind and character of property held, and to make disposition thereof according to some plan formed in the testator's mind." *In re Estate of Osborn*, 234 Ill. App. 3d 651, 658, 599 N.E.2d 1329, 1333 (1992) (citing *In re Estate of Wrigley*, 104 Ill. App. 3d 1008, 1017, 433 N.E.2d 995, 1003 (1982)).

The parties dispute the relevant dates for assessing competence, specifically the effective date of the LPL transfer-on-death instrument. Whitaker argues that Elias lacked the mental capacity to execute the transfer on death instrument, and that the timing of delivery of an instrument naming beneficiaries is relevant to show what the decedent's intent was, citing to *Kniffen v. Kniffen*, 119 Ill. App. 3d 106, 110, 456 N.E.2d 659, 662 (1983). However, *Kniffen* is inapposite. In *Kniffen*, the issue was the decedent's intent in changing a beneficiary and whether he took sufficient "positive action" to effect a change in the designated beneficiary. *Kniffen*, 119 Ill. App. 3d at 110, 456 N.E.2d at 662.

McDonnell maintains that the timing of delivery of the transfer on death document is irrelevant, as it is undisputed that it was executed in August 2006. We agree. For evidence in cases involving questions of mental capacity and undue influence to be relevant, it must bear on the factors of mental capacity and undue influence existing at the time of the execution of the testamentary document in issue. *In re Estate of Berry*, 170 Ill. App. 3d 454, 458, 524 N.E.2d 689, 692 (1988). When construing the date upon which a legal instrument was executed, the date

on the instrument is generally considered *prima facie* evidence of the date of execution. *Sterdjevich v. RMK Management Corp.*, 343 Ill. App. 3d 1, 14, 796 N.E.2d 1146, 1158 (2003). However, we recognize the existence of substantial discretion in the trial court to determine the time frame within which events concerning the testator are relevant to the capacity of the decedent in a will contest. *In re Estate of Berry*, 170 Ill. App. 3d at 458, 524 N.E.2d at 692.

Here, the date of execution of the LPL transfer-on-death instrument was August 12, 2006. The manifest weight of the evidence shows that Whitaker met her burden of establishing that Elias lacked testamentary capacity on that date. The evidence at trial established that Elias was already suffering moderate to severe cognitive impairment when McDonnell brought Elias to Illinois, which McDonnell herself witnessed. SanFilippo evaluated Elias for her mini-mental-status examination at Alexian Brothers on December 23, 2005, and at that time Elias already had poor insight into her finances, and it was recommended that Elias not live alone for safety concerns due to her memory and behavior problems. In July 2006, Dr. Weise's examination revealed Elias only knew what day it was and what town she was in. Elias exhibited moderate to severe impairment. Elias needed help with instrumental activities of daily living, including managing money. On August 1, 2006, McDonnell herself left a message that Elias did not always eat, forgot to go to her meals and was not taking showers. This was shortly before the execution of the transfer on death form on August 12, 2006. Even before McDonnell moved Elias to Illinois, Elias had several car accidents, one which she could not even remember, and did not remember executing a note on her vehicle.

Also very close to the time of execution of the transfer on death form, on September 12,

24

2006, Elias did not know the season, month, day, date, or the location of where she was in terms of state, county, town or city, hospital or floor. Another message from McDonnell on November 21, 2006, indicated that Elias was wandering into other residents' apartments and was accusing people of stealing her belongings. On January 12, 2007, McDonnell reported to Dr. Weise that Elias was naked in her apartment when the staff at Lake Barrington Woods would bring her breakfast, and she went down the hall with only a nightgown on. By March 21, 2007, Elias only knew that it was spring, and Elias had been moved to a dementia-specific unit. By that time, Elias could not recall the name of her husband or children, nor could she even remember how many children she had. McDonnell's expert did not consider the bulk of this evidence.

Thus, the manifest weight of the evidence established that Elias did not comprehend the kind and character of her property or make proper dispositions, and did not have sufficient mental ability regarding the natural objects of her bounty. See *In re Estate of Osborn*, 234 Ill. App. 3d at 658, 599 N.E.2d at 1333. We find the trial court's determination that Elias lacked capacity at the time of the execution of the LPL transfer-on-death document and transfers of personal property was not against the manifest weight of the evidence.

B. Undue Influence and Fraudulent Transfer

McDonnell next argues that the trial court actually made no finding that the transfer on death certificate was executed as the product of undue influence. McDonnell suggests that Whitaker's argument for affirmance on the issue of undue influence in reality seeks an alternate ruling finding undue influence where there was none, if we find no lack of testamentary capacity.

However, the concepts of a presumption of a fraudulent transaction due to a fiduciary

25

relationship and undue influence are inextricably intertwined, and the court did in fact find that McDonnell used undue influence. Undue influence necessary to invalidate a will is that influence which prevents the testator from exercising her own free will in the disposition of her estate, and it must be directly connected with the execution of the instrument, operate at the time it was made, and be directed toward procuring the will in favor of a particular party or parties. *In re Estate of Maher*, 237 Ill. App. 3d 1013, 1017, 606 N.E.2d 46, 49-50 (1992). A payable-on-death account is a will substitute (*In re Estate of Waitkevich*, 25 Ill. App. 3d 513, 518, 323 N.E.2d 545, 549 (1975)), and thus the same requirements to show undue influence apply to set aside dispositions of payable-on-death accounts.

"A *prima facie* case of undue influence is made out where: (1) a fiduciary relationship existed between a testator and a person receiving a substantial benefit under the will (compared to others who have an equal claim to a testators bounty); (2) the testator was in a dependent situation in which the substantial beneficiaries were in dominant roles; (3) the testator reposed trust and confidence in such beneficiaries; and (4) a will was prepared or procured and executed in circumstances wherein such beneficiaries were instrumental or participated." *Pedott v. Dorman*, 192 Ill. App. 3d 85, 90-91, 548 N.E.2d 541, 544 (1989). A fiduciary or confidential relationship may be found in one of two ways. A fiduciary relationship may be found to exist as a matter of law from the relationship of the parties, such as an attorney-client relationship, or may be found to exist by the facts of a particular situation, such as a relationship where trust is reposed on one side and results in superiority and influence on the other side. *In re Estate of Long*, 311 Ill. App. 3d 959, 963, 726 N.E.2d 187, 190 (2000). A power of attorney gives rise to a general fiduciary

26

relationship between the grantor of the power and the grantee as a matter of law. *White v. Raines*, 215 Ill. App. 3d 49, 59, 574 N.E.2d 272, 279 (1991). "If a petitioner shows that a fiduciary relationship exists, any transaction between parties in which the agent profits is typically presumed to be fraudulent and the agent has the burden of proving by clear and convincing evidence that the transaction was fair and equitable and did not result from the agent's undue influence over the principal." (Internal quotation marks omitted.) *Janowiak v. Tiesi*, 402 Ill. App. 3d 997, 1005, 932 N.E.2d 569, 578 (2010) (quoting *In re Estate of Miller*, 334 Ill. App. 3d 692, 698, 778 N.E.2d 262, 267 (2002), citing *In re Estate of Teall*, 329 Ill. App. 3d 83, 87, 768 N.E.2d 124, 129 (2002)); *Lemp v. Hauptmann*, 170 Ill. App. 3d 753, 757, 525 N.E.2d 203, 206 (1988).

Contrary to McDonnell's assertion, the trial court indeed did find undue influence, as is clear from the court's written order:

> "Once Whitaker showed that a fiduciary relationship exists between McDonnell and [Elias] the presumption is that a transfer between McDonnell and [Elias] is fraudulent. McDonnell has to come forward [with] clear and convincing evidence that the transfer was not the result of *undue influence*. McDonnell's testimony is not credible and all sums must be returned." (Emphasis added.)

McDonnell does not dispute that the LPL transfer-on-death document was executed, and the personal property and cash transfers all occurred, after McDonnell became Elias' fiduciary under the general power of attorney. However, McDonnell claims she did not "activate" the power of attorney until Elias broke her hip in April 2007. Her claim is neither legally nor factually

27

sound.  First, it is well established that  a power of attorney gives rise to a general fiduciary relationship as a matter of law.  *White*, 215 Ill. App. 3d at 59, 574 N.E.2d at 279.  Second, Elias executed a separate health care power of attorney to govern any medical decisions.  The durable power of attorney granted broad powers to McDonnell to handle and dispose of Elias' real and personal property.

The LPL transfer-on-death document was executed after Elias' grant of the general durable power of attorney to McDonnell.  Likewise, the alleged gifting of the personal property occurred after the power of attorney was executed and McDonnell became Elias' fiduciary.  Thus, McDonnell was Elias' fiduciary at the time of the execution of the LPL transfer-on-death document and the disposition of the personal property.  The trial court correctly determined that there was a presumption that these transactions were fraudulent and McDonnell had to prove by clear and convincing evidence that these transactions did not result from her undue influence over Elias.  See *White*, 215 Ill. App. 3d at 59, 574 N.E.2d at 279 (the transactions between the defendant and the decedent occurred after the grant of the power of attorney by the decedent; therefore, the presumption was that the transactions were fraudulent and the defendant had the burden of proving by clear and convincing evidence that the transactions were fair and equitable to the decedent and did not result from his undue influence over the decedent).

McDonnell failed to come forward with sufficient evidence to rebut the presumption that the execution of the transfer-on-death form was fraudulent.  Based on the evidence at trial, McDonnell clearly engaged in a pattern of increasingly isolating Elias from all other family members, especially Whitaker, moved Elias away from Ohio to Illinois, took over all aspects of

Elias' finances and health care, and abused her fiduciary duty under the general power of attorney in effecting the LPL transfer on death disposition and taking Elias' personal property. The evidence at trial established that McDonnell gave Elias the LPL transfer-on-death form and merely told Elias that Turner at LPL wanted her to fill out the form. She was alone with Elias and filled out the entire form, other than Elias' signature. Elias did not seek any independent advice regarding the execution of the form.

McDonnell argues that "[m]utual respect, confidence and trust between parent and child, and care for an aging parent by a child, are to be fostered and admired, not looked upon with suspicion." However, proof of the existence of an affectionate relationship between the testator and a preferred beneficiary is not sufficient to rebut a presumption of undue influence. *In re Estate of Mooney*, 117 Ill. App. 3d 993, 998, 453 N.E.2d 1158, 1161-62 (1983).

McDonnell's only evidence offered at trial to rebut the presumption that she used undue influence is the alleged argument between Elias and Whitaker. However, as the trial court cogently observed:

> "In my experience and observation, it is not palpable [*sic*] that [Elias] based upon one incident or altercation, which was not reported or memorialized, would alter her and her husband's long standing estate planning giving all her property to one daughter but not change her will."

The trial court's determination that McDonnell failed to rebut the presumption of undue influence is not against the manifest weight of the evidence. See *In re Estate of Mooney*, 117 Ill. App. 3d at 998, 453 N.E.2d at 1161 (in the absence of evidence that testator received any independent

29

advice in the preparation of disputed will or that he understood the contents of the will, or that the witnesses witnessed the will at the request of the testator, presumption of undue influence was not rebutted). Therefore, we affirm the trial court's order of August 11, 2009, ordering that McDonnell return to the estate the sum of $471,750 and the personal property belonging to the estate.

II. Order Awarding Attorney Fees Assessed Against the Estate and Not Against McDonnell

Both parties appeal the order awarding attorney fees and ordering that the fees be paid out of the estate. McDonnell requests that we affirm the order. Whitaker seeks reversal of the order and argues that the trial court should have assessed all fees and costs against McDonnell due to her misconduct.

Initially, we clarify our standard of review. Whitaker argues that we should employ a *de novo* standard of review, citing *Grate v. Grzetich*, 373 Ill. App. 3d 228, 231, 867 N.E.2d 577, 579 (2007), for the proposition that a question whether a court has the authority to award attorney fees is a question of law and must be reviewed *de novo*. However, there is nothing before us that indicates the trial court entered its order on the basis that it lacked authority to assess fees against McDonnell. Whitaker did not provide us the transcript of the hearing on Whitaker's supplemental petition for attorney fees, and there is nothing cited in the record from which we can conclude that the trial court determined that it lacked authority to assess attorney fees against McDonnell. The court's order of November 19, 2009, awarding attorney fees to be paid by the estate does not state any underlying reasoning. In the absence of a sufficient record, we must resolve any doubts arising from the incompleteness of the record against the appellant

30

and presume the trial court's order was in conformance with the law. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392, 459 N.E.2d 958, 959 (1984). Thus, we must assume the trial court was aware of its authority to assess attorney's fees against McDonnell. When a court with proper authority to award attorney fees exercises its authority, appellate courts review the decision to award attorney fees under an abuse of discretion standard. *Grate*, 373 Ill. App. 3d at 231, 867 N.E.2d at 579.

The Probate Act entitles estate representatives to reasonable fees for their services, subject to the circuit court's discretion based upon such factors as the size of the estate, the work done, the skill evidenced by the work, the time expended, the success of the efforts involved, good faith, and the efficiency with which the estate was administered. 755 ILCS 5/27-1 (West 2008); *In re Estate of Dyniewicz*, 271 Ill. App. 3d 616, 624, 648 N.E.2d 1076, 1082-83 (1995) (citing *In re Estate of Devoy*, 231 Ill. App. 3d 883, 888, 596 N.E.2d 1339, 1343 (1992)). Counsel fees will be rejected when the legal services rendered are not in the interest of or do not benefit the estate. *In re Estate of Dyniewicz*, 271 Ill. App. 3d at 624, 648 N.E.2d at 1082-83 (citing *In re Estate of Minsky*, 59 Ill. App. 3d 974, 979, 376 N.E.2d 647, 651 (1978)); *In re Estate of Breault*, 63 Ill. App. 2d 246, 254, 211 N.E.2d 424, 429 (1965). "The decision to grant attorney fees under this provision rests within the circuit court's sound discretion." *Dyniewicz*, 271 Ill. App. 3d at 624-25, 648 N.E.2d at 1083 (citing *In re Estate of Knott*, 245 Ill. App. 3d 736, 739, 615 N.E.2d 357, 359 (1993)).

Here, the trial court did not abuse its discretion in awarding Whitaker's attorney fees and costs as executor. The trial court's assessment of Whitaker's attorney fees against the estate reflects the court's determination that she was properly defending Elias's will. See *In re Estate of*

*Settle*, 97 Ill. App. 3d 552, 555, 422 N.E.2d 1008, 1010 (1981) (the trial court's assessment of attorney fees against an estate reflected a determination that the executor was properly fulfilling her statutory duty to defend the will). We find no abuse of discretion in this determination that Whitaker was properly acting as executor in defending Elias's will and that she was entitled to attorney fees. We therefore affirm the order insofar as it granted the petition for $201,227.50 in attorney fees and $33,135.85 in costs through November 16, 2009.

However, the question is whether all of the fees and costs should be assessed against the estate, or against McDonnell. Whitaker seeks the assessment of all fees and costs against McDonnell due to her misconduct. McDonnell responds that fees cannot be assessed against her due to the "American rule." Illinois normally follows the "American rule," which stands for the proposition that each party is responsible for his or her own attorney fees. *In re Marriage of Pal*, 397 Ill. App. 3d 903, 910, 924 N.E.2d 30, 36 (2010). Generally, under the "American rule," a successful litigant may not recover attorney fees in the absence of a statute or a contractual agreement between the parties permitting recovery of attorney fees. *Goldstein v. DABS Asset Manager, Inc.*, 381 Ill. App. 3d 298, 302, 886 N.E.2d 1117, 1121 (2008). Thus, ordinarily, the losing party in a lawsuit cannot be required to pay attorney fees to the winning party. *Bjork v. Draper*, 381 Ill. App. 3d 528, 543, 886 N.E.2d 563, 576 (2008).

However, the circuit court has broad discretionary powers in awarding an executor's attorney fees. *In re Estate of Laas*, 171 Ill. App. 3d 916, 920, 525 N.E.2d 1089, 1092 (1988). Also, section 16-1(d) of the Probate Act regarding citations to discover assets provides that the court "may enter such orders and judgment as the case requires." 755 ILCS 5/16-1(d) (West

32

2008). Furthermore, a trial court is endowed with broad discretion to fashion remedies and grant such relief as equity may require to remedy a wrong. *Tully v. Edgar*, 286 Ill. App. 3d 838, 847, 676 N.E.2d 1361, 1367 (1997).

We note that although the Probate Act compels payment for the reasonable services of attorneys for executors, there is no provision in the Probate Act requiring that the executor's attorney's fees and costs be paid exclusively from the estate. The Probate Act merely provides: "The attorney for a representative is entitled to reasonable compensation for his services." 755 ILCS 5/27-2 (West 2008). "Executors and attorneys representing executors *shall* be allowed reasonable compensation for their services" (emphasis added) (*In re Estate of Minsky*, 59 Ill. App. 3d 974, 978, 376 N.E.2d 647, 650 (1978)), but "the court *may* authorize reasonable attorney's fees to be paid from the assets of the estate" (emphasis added) (*In re Estate of Minsky*, 59 Ill. App. 3d at 979, 376 N.E.2d at 651).

Whitaker cites to *Catherwood v. Morris*, 345 Ill. 617, 633-34, 178 N.E. 487, 493 (1931), and *Father & Sons, Inc. v. Taylor*, 301 Ill. App. 3d 448, 455-56, 703 N.E.2d 532, 537 (1998), for the proposition that where there was a breach of fiduciary duty, the "fiduciary must pay the attorney's fees out of her own assets, rather than utilize any share of the Estate's assets for this purpose." Whitaker also cites to *Grate*, 373 Ill. App. 3d at 230-31, 867 N.E.2d at 579, where the court held that a trustee who breached his fiduciary duty by converting trust assets was precluded from using the trust assets to pay for his attorney fees. However, *Catherwood* did not address attorney fees at all, and *Taylor* addressed attorney fees under the Illinois Consumer Fraud and Deceptive Business Practices Act (Act) (815 ILCS 505/10(a) (West 1996)), which statutorily

33

entitles a prevailing party to attorney's fees from the other party, a claim wholly distinct from the present case. *Grate* held that a trustee could not have his attorney fees paid from the trust estate where the trustee breached his fiduciary duty by converting trust assets for personal use and thus did not incur the attorney fees while protecting the trust's assets. *Grate*, 373 Ill. App. 3d at 231, 867 N.E.2d at 579. Here, we are presented with a trustee who was acting to protect the estate's assets. Thus, none of Whitaker's cited cases are on point.

However, there is long-standing precedent in Illinois for applying the doctrine of equitable contribution to apportion the payment of attorney fees in probate cases where appropriate. In *Jackman v. North*, 398 Ill. 90, 75 N.E.2d 324 (1947), where guardians *ad litem* were appointed for minors who were parties in a will contest, an order assessing one-half of the fees of the guardians *ad litem* against an unsuccessful contestant and the remaining one-half against the testatrix' estate was held not to be an abuse of discretion. Similar to this case, in *Jackman* the suit was brought to have the will held invalid due to lack of mental capacity, although in *Jackman* the evidence was held to be insufficient to present a question for a jury. The plaintiff had moved that all fees and costs be taxed against the estate or, in the alternative, apportioned equitably among the respective parties. *Jackman*, 398 Ill. at 108, 75 N.E.2d at 333. Initially, the court assessed all fees and costs against the plaintiff, but upon plaintiff's motion, the court reconsidered the guardian *ad litem* fees and ordered that one half of the fees be assessed against the plaintiff and the other half against the estate. *Jackman*, 398 Ill. at 107-08, 75 N.E.2d at 333. The court noted that the prior Chancery Act provided that "one appointed as a guardian *ad litem* shall be allowed a reasonable sum for his charges, to be fixed by the court and taxed in the bill of costs."

1-09-3328 and 1-09-3451 (consolidated)

*Jackman*, 398 Ill. at 108, 75 N.E.2d at 333. Our current Probate Act similarly provides that "[t]he attorney for a representative is entitled to reasonable compensation for his services." 755 ILCS 5/27-2 (West 2008).

In *In re Estate of Breault*, 63 Ill. App. 2d 246, 211 N.E.2d 424 (1965), the executor's attorney was entitled to attorney fees from nonprobate assets under the doctrine of equitable contribution. In the past, the probate court's limited jurisdiction prevented it from reaching non-probate assets. However, that changed under the overhauled jurisdiction provisions of the Illinois Constitution. As the *Breault* court explained:

"There is a growing body of law that the doctrine of equitable contribution extends to attorneys' fees for services rendered to an executor with respect to nonprobate assets. ***

* * *

Heretofore, the primary obstacle to applying the doctrine of equitable contribution was the fact that the Probate Court lacked the power to assess fees against property not within the court's jurisdiction. *** But as of January 1, 1964, Illinois has replaced the limited jurisdiction of the Probate Court with the unified general jurisdiction of the Circuit Court pursuant to sec[tion] 9 of the New Judicial Article VI of the Illinois Constitution, granting to the circuit court 'unlimited original jurisdiction of all justiciable matter.' " *In re Estate of Breault*, 63 Ill. App. 2d at 268-70, 211 N.E.2d at 436-37.

The court concluded:

"We find no jurisdictional limitations upon the trial court as the Probate Division

35

of the Circuit Court which prevented it from reaching the nonprobate assets, and no justifiable reason why petitioner should not be compensated. ***

Furthermore, we find substance in petitioner's additional contention that the duty to compensate for such services out of the nonprobate assets may often be quasi-contractual and binding on those benefitted. Such quasi-contractual obligations are often founded upon a statutory, official, or customary duty, and arise when the court seeks to uphold the fundamental principle that no one ought to enrich himself unjustly at the expense of another. [Citations.]" *In re Estate of Breault*, 63 Ill. App. 2d at 272-73, 211 N.E.2d at 438.

There is also recent precedent awarding fees and costs as punitive damages in circumstances where there is a breach of fiduciary duties and disregard of another beneficiary's rights under a will. In *In re Estate of Talty*, 376 Ill. App. 3d 1082, 877 N.E.2d 1195 (2007), we affirmed a trial court's assessment of attorney fees and costs as punitive damages against an executor who breached his fiduciary duty and disregarded the widow beneficiary's rights. The decedent's will gave the executor, who was the decedent's brother, the right to purchase the decedent's shares of stock and property interests, which he did. *In re Estate of Talty*, 376 Ill. App. 3d at 1086, 877 N.E.2d at 1201. Based on a complaint filed by the widow, the trial court found that the brother's actions as executor were in bad faith and an abuse of discretion, and the sales were vacated. *In re Estate of Talty*, 376 Ill. App. 3d at 1086-87, 877 N.E.2d at 1202. After new appraisals were done, the brother was ordered to pay additional sums and was ordered to pay for the widow's attorney's fees and costs. *In re Estate of Talty*, 376 Ill. App. 3d at 1087, 877

36

N.E.2d at 1202. The *Talty* court interpreted the award of attorney fees and costs as punitive damages and noted that punitive damages are "awarded only when a respondent's conduct is willful or outrageous due to evil motive or a reckless indifference to the rights of others." *In re Estate of Talty*, 376 Ill. App. 3d at 1093, 877 N.E.2d at 1207. The court went on to note that "[a]ttorney fees and costs are an element of punitive damages." *In re Estate of Talty*, 376 Ill. App. 3d at 1094, 877 N.E.2d at 1207. The court affirmed the attorney fees award, concluding that "[s]uch an award was clearly necessary to punish William for disregarding the rights of Helen as beneficiary under [the decedent's] will." *In re Estate of Talty*, 376 Ill. App. 3d at 1094, 877 N.E.2d at 1207.

Thus, based on our review of both long-standing precedent regarding equitable contribution and recent precedent awarding attorney fees and costs as punitive damages, the circuit court in its discretion can assess attorney fees against parties other than the estate. Attorney fees for an executor can be assessed against a party in a probate proceeding based either on equitable contribution, or as punitive damages where there was willful or outrageous conduct due to evil motive or a reckless indifference to the rights of others.

Based on the fact that the trial court found the entirety of McDonnell's testimony not credible, and that McDonnell breached her fiduciary duty and fraudulently transferred all sums and personal property in question, an award of attorney fees solely from the estate's funds is inconsistent with these findings and is an abuse of discretion. Therefore, we reverse that portion of the fee order assessing the fees and costs solely against the estate, and remand the matter to the circuit court for a proper determination of the amount of attorney fees and costs Whitaker

incurred to recover the estate property and funds from McDonnell, and order that this amount be assessed against McDonnell. The remaining amount of fees and costs incurred for estate administration not related to McDonnell's wrongful conduct is to be assessed against the estate.

CONCLUSION

Because we find the circuit court's finding of lack of mental capacity and use of undue influence was not against the manifest weight of the evidence, we affirm the judgment of the circuit court of August 11, 1009, ordering McDonnell to return $471,750 in cash and personal property to Elias' estate.

However, based on the court's findings, assessing Whitaker's attorney fees and costs wholly against the estate, and not also against McDonnell, was an abuse of discretion. Therefore, we affirm the fee order insofar as it awards the stated amount in attorney fees and costs, but reverse the portion of the order assessing all fees and costs against the estate only and remand for a determination of the amount of attorney and costs incurred to recover the wrongfully transferred funds and property from McDonnell, and order that this amount of fees and costs be assessed against McDonnell. We further instruct that the remaining amount of attorney fees and costs incurred for estate administration not related to McDonnell's wrongful conduct is to be assessed against the estate.

Affirmed in part; and reversed in part; cause remanded with instructions.

1-09-3328 and 1-09-3451 (consolidated)

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

*In Re* ESTATE OF MARGERY M. ELIAS, Deceased

Margaret K.H. Whitaker, as Independent Executor of
the Estate of Margery M. Elias, Deceased,

      Petitioner-Appellee and Cross-Appellant,

        v.

Eleanor A.H. McDonnell,

      Respondent-Appellant and Cross-Appellee.

**Nos. 1-09-3328; 1-09-3451 (Cons.)**

**Appellate Court of Illinois**
**First District, FOURTH DIVISION**

**March 24, 2011**

**Justice Pucinski delivered the opinion of the court with opinion.**

**Presiding Justice Gallagher and Justice Lavin concurred in the judgment and opinion.**

Appeal from the Circuit Court of Cook County.
The Hon. James W. Kennedy, Judge Presiding.

**COUNSEL FOR APPELLANT AND CROSS-APPELLEE:**

HARRISON & HELD, L.L.C., of Chicago, IL
(George N. Vurdelja, Jr.)

**COUNSEL FOR APPELLEE AND CROSS-APPELLANT:**

ESP, KREUZER, CORES & McLAUGHLIN, LLP, of Wheaton, IL
(Kenneth S. McLaughlin, Jr.)

39

1-09-3328 and 1-09-3451 (consolidated)