NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2019 IL App (4th) 190038-U

NO. 4-19-0038

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 5, 2019
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| HANNA STRUEVER, Individually and as | ) | Appeal from |
| Administrator for the Estate of Nathan C. Struever, | ) | Circuit Court of |
| Plaintiff-Appellee and | ) | Calhoun County |
| Cross-Appellant, | ) | No. 13L8 |
| v. | ) | |
| MARY ANN YOSWIG, a/k/a MARY ANN HERREN, | ) | Honorable |
| Defendant-Appellant and | ) | John Frank McCartney, |
| Cross-Appellee. | ) | Judge Presiding. |

PRESIDING JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Steigmann and Cavanagh concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed in part and reversed in part, concluding (1) the trial
court's finding that defendant failed to overcome plaintiff's established
presumption of undue influence surrounding the creation of decedent's 2007 will
and trust was not against the manifest weight of the evidence (2) the trial court did
not err in declining to award plaintiff additional funds in the amount of
$10,079.87, but (3) the trial court did err in awarding attorney fees where it
declined to award punitive damages.

¶ 2     Defendant, Mary Ann Yoswig a/k/a Mary Ann Herren, appeals the judgment of

the trial court finding for plaintiff, Hannah Struever, individually and as administrator for the

estate of Nathan C. Struever, where (1) defendant failed to overcome plaintiff's established

presumption of undue influence surrounding the creation of decedent's October 2007 will and

trust and (2) the court awarded plaintiff attorney fees to be paid by defendant. On appeal,

defendant argues (1) plaintiff failed to prove allegations of undue influence; (2) plaintiff's proof

failed to conform to the pleadings; (3) a presumption of undue influence failed to arise at trial;

(4) the court erroneously shifted the burden of proof to defendant; (5) the court erred in granting plaintiff attorney fees; (6) the court erred in certain evidentiary rulings; (7) the court erred in creating a new theory after the close of evidence; (8) the court erred in denying defendant's motion for summary judgment, motion for directed verdict, and motion to reconsider; and (9) the court's finding of undue influence was against the manifest weight of the evidence.

¶ 3 Plaintiff agrees with the trial court's finding of undue influence but cross-appeals, arguing the court erred by (1) failing to award plaintiff $10,079.87 misappropriated by defendant and (2) declining to award plaintiff punitive damages. For the following reasons, we affirm in part and reverse in part.

¶ 4                                      I. BACKGROUND

¶ 5                                   A. Procedural History

¶ 6 In July 2015, plaintiff filed her third amended complaint alleging, in relevant part, that defendant asserted undue influence over decedent, John O. "Pete" Schumann, at the time of the execution of decedent's 2007 will and trust, where (1) defendant took decedent against his will to defendant's lawyer, (2) decedent signed the 2007 will and trust because defendant led him to believe that the nursing home would take his farm, and (3) defendant "made arrangements with an attorney who already had an existing relationship with her family for the transfer of all [of decedent's] trust assets[, including] the farm, investment accounts, and all other property to either her and/or to a trust making her the owner or residual beneficiary contrary to her fiduciary responsibility to the trust, [decedent, and plaintiff]." In June 2015, defendant filed an answer to plaintiff's third amended complaint.

¶ 7 In June 2017, defendant filed a motion for summary judgment on multiple counts, including plaintiff's claim of undue influence. Regarding plaintiff's claim for undue influence,

defendant argued no facts support the proposition that defendant procured the preparation of decedent's 2007 will and trust or transfer of his farm out of his 2002 trust. In October 2017, the trial court denied defendant's motion for summary judgment finding there existed an issue of material fact.

¶ 8           In March 2018, defendant filed a motion *in limine* to exclude Doctor Ronald Johnson's testimony. Dr. Johnson was a treating provider of the decedent and is an expert in the field of dementia. On March 22, 2018, the trial court held a hearing on defendant's motion *in limine*. At the hearing, defendant's attorney argued that Dr. Johnson's testimony lacked relevance where Dr. Johnson in his evidence deposition testified, "[I]t's possible [decedent] could have difficulty understanding a trust, but it's also plausible that he could have executed that trust on that day." Dr. Johnson never spoke to decedent about his trust. Plaintiff's attorney argued defense counsel's stipulation to Dr. Johnson's qualifications to give an opinion on decedent made the motion inappropriate. The court denied defendant's motion *in limine* finding the testimony relevant.

¶ 9           The matter proceeded to a five-day bench trial in April 2018. Below, we summarize the relevant evidence presented at trial.

¶ 10                            B. Plaintiff's Bench Trial

¶ 11          In 1985, decedent married Alice, who had two children, Nathan Struever and Hanna Struever, from a previous marriage. Decedent had no children of his own. During their marriage, decedent and Alice jointly owned and resided on 120 acres of real property located in Calhoun County, Illinois, more particularly described as the "Home Farm."

¶ 12          On October 21, 2002, decedent and Alice went to their attorney, Steven Dawson, in Godfrey, Illinois, and executed individual reciprocal revocable trusts and wills funded by

assets of both decedent and Alice. Alice's trust provided for Alice during her lifetime, and upon her death, for decedent. Upon decedent's death, Alice's trust was to continue for the benefit of her children, and, when they turned 45 years old, they were to receive the remainder. Decedent's trust contained provisions parallel to Alice's trust. Decedent's trust provided for decedent during his lifetime, and, upon his death, to Alice, if she survived him, and then for the benefit of Nathan and Hanna. When the children turned 45 years of age, they were to receive their proportionate share of the principal held by decedent's trust.

¶ 13        Both Alice and decedent's trusts further provided that Alice act as a trustee of her trust, and decedent act as a trustee of his trust until they died, resigned, or became unable to act, at which point the trusts required their spouse to act as a co-trustee with defendant. Neither trust made a bequest or gift to defendant.

¶ 14        At the same time decedent and Alice executed their trusts, they both created reciprocal wills which poured over the assets to their respective trusts. These wills named their spouse as executor, and defendant as the first alternative executor. On October 21, 2002, when they created their trusts and wills, decedent and Alice conveyed their Home Farm to decedent's trust. Additionally, they divided their personal assets and placed such assets and investment accounts in each individual's mutual trust.

¶ 15        On January 2, 2006, Alice passed away at the age of 74 years old. At the time of her death, decedent was 88 years of age. On the evening of Alice's death, decedent called his neighbor and friend Joyce Titus requesting help because he believed that Alice had passed away. Joyce along with several of her adult children—who were also neighbors of decedent—went to his residence to assist. Once they arrived at decedent's home, Chuck Titus and Lance Titus lifted

Alice's body and placed her on the bed. Lance Titus testified decedent was very upset by his wife's passing. Joyce testified that decedent instructed her to contact Nathan.

¶ 16 Lance Titus testified that decedent asked the Titus family to contact another neighbor, Patricia "Patsy" Herren. Patsy and defendant both came to decedent's residence that night. Shortly after defendant arrived, she told the Titus family they were no longer needed and should leave. Brianna Sibley, the daughter of Joyce, testified she felt uncomfortable after defendant told her family they were no longer needed.

¶ 17 When Alice died on January 2, 2006, decedent and defendant became co-trustees of Alice's trust. On January 26, 2006, decedent executed a healthcare power of attorney appointing defendant as power of attorney for his healthcare. At this point, defendant became decedent's primary caregiver.

¶ 18 Decedent's health rapidly declined after Alice's death. In May 2006, defendant took decedent to Dr. Johnson, when decedent complained of dizziness. Dr. Johnson noted that decedent showed signs of confusion and hearing loss, and Dr. Johnson had difficulty getting a history. Dr. Johnson characterized decedent as "more or less a deer in the headlights."

¶ 19 Defendant communicated with decedent's doctors regarding his health and in making appointments. Multiple witnesses testified that decedent was hard of hearing. Lance Titus testified that he spoke with defendant after she returned from a doctor's appointment with decedent and defendant discussed the onset of dementia. Lance Titus and defendant discussed taking away decedent's car keys.

¶ 20 In May 2006, investment funds of both Alice's trust and decedent's trust were moved to UBS Financial Services, Inc. (UBS). On June 12, 2006, decedent executed a durable power of attorney which granted defendant authority over decedent's personal and business

affairs. Shortly thereafter, decedent authorized defendant to control assets of his trust. Defendant also paid bills, withdrew cash, and handled other matters relating to decedent's 2002 trust. Defendant testified she cashed checks for decedent and that half went into decedent's savings and the other half came back in cash. Defendant testified she never compensated herself after she cashed checks for decedent.

¶ 21 Decedent continued to live on the Home Farm after Alice's death. Neighbors of decedent, most notably multiple members of the Titus family, testified that after Alice's death defendant began alienating decedent from them by restricting their access to decedent. Multiple witnesses testified that at some point a gate was installed with a no trespassing sign on decedent's property. Lance Sibley leased decedent's Home Farm for $1000 a year from 2006-2009 for deer hunting. Sometime after Alice's death, he received a letter from defendant's attorney informing him that he was no longer allowed on the property without defendant's permission.

¶ 22 Throughout 2007, defendant prepared decedent's bills, wrote checks, provided transportation for shopping, doctor visits, and spoke to his medical providers about his treatment and appointments. Defendant maintained a log outlining the services with which she helped decedent. Patsy provided decedent's meals.

¶ 23 On May 15, 2007, defendant sent a 12-page fax from her place of employment to attorney Timothy P. Fleming's office. For years, attorney Fleming provided legal services to defendant's father, Gene Herren. The fax contained (1) decedent's healthcare power of attorney signed October 21, 2002; (2) the 1985 deed conveying the Home Farm to Alice and decedent as joint tenants with rights of survivorship; (3) decedent's durable power of attorney signed June 12, 2006; (4) decedent's healthcare power of attorney signed January 26, 2006; (5) a bill of sale

whereby decedent placed certain personal property into his 2002 trust; and (6) decedent's property power of attorney dated 2002. On that same day, defendant sent another fax from her place of employment to attorney Fleming's office which contained the 2002 deed conveying decedent's home and farmland into decedent's 2002 trust and decedent's 2002 will.

¶ 24 Telephone messages from attorney Fleming's office showed defendant contacted attorney Fleming on May 15 and May 17. While no year was provided, the telephone calls coincide with defendant's faxes sent on May 15, 2007. Two other messages were left for attorney Fleming to call defendant back; while no dates were provided, the messages fell between May 2007 and October 2007. Attorney Fleming's administrative assistant, Donna Swanson, testified the messages were put in chronological order. Decedent never contacted attorney Fleming's office.

¶ 25 On July 11, 2007, plaintiff, through her attorney, sent a letter to decedent inquiring about her mother's estate. Defendant faxed the letter to decedent's attorney, Tammy Julian. Plaintiff received a letter informing her that no additional information would be provided to her until she became a beneficiary which would not take place until after decedent's death.

¶ 26 Multiple members of the Titus family testified to the close relationship between decedent and the Titus family. Members of the Titus family helped decedent farm alfalfa on the Home Farm. Many members of the Titus family also testified that decedent discussed selling the Home Farm to members of the Titus family in the future. Lance Titus testified decedent told him that he did not want Gene Herren to purchase the Home Farm. About a year after Alice passed away, Lance Titus testified that he and decedent discussed the purchase of the farm. Plaintiff's attorney asked Lance Titus whether it would surprise him that in October 2007, a year and 10

months after Alice's death, decedent signed the whole farm over to defendant. Lance Titus responded, "That would shock me."

¶ 27        Lance Sibley testified that in the fall of 2007, he and decedent discussed the Titus family purchasing the Home Farm. Lance Sibley testified that decedent expressed desire for a member of the Titus family to purchase the farm but that he was waiting until spring to decide. Lance Sibley testified that decedent told him that he would give him the property before he would sell it to the Herren family. Chuck Titus also testified to decedent once stating, "[D]on't worry, Chuck, I would give [the farm] away before I sold it to Gene Herren."

¶ 28        Dennis Herren, defendant's brother, testified that he would joke with decedent and Alice about giving him the Home Farm, but Alice would always indicate it was going to her kids. Dennis testified that in 2007 he was aware of attempts by his father, Gene, to have decedent sign his farm over to Gene.

¶ 29        Holly Desherlia worked at Herren Hardware in 2007 and testified to a time when defendant walked into the store and told her father that decedent was upset because he thought all the Herrens wanted was his farm. Desherlia testified that on another occasion she recalled a conversation between defendant and Gene, where Gene told defendant to hurry up and take decedent to a lawyer before he changed his mind.

¶ 30        Multiple witnesses testified they never heard decedent voice displeasure with his stepchildren. However, Patsy claimed decedent did express displeasure regarding his stepchildren.

¶ 31        On October 1, 2007, defendant left a message with attorney Fleming's office that "[decedent] is ready to go—when can you come to Jerseyville or Alton[?]". On October 18, 2007, decedent, who at this point was 90 years old, met with attorney Fleming at Robert Perica's

law office because it was closer to where decedent lived. Attorney Fleming testified that prior to the meeting he did not recall ever meeting decedent and he had no recollection of ever talking to decedent on the phone. Attorney Fleming testified he prepared for the meeting: a deed, a revocation of a prior trust, a pour-over will, and two powers of attorney. Attorney Fleming failed to recall whether decedent drove himself to the meeting. Attorney Fleming testified he failed to notice an issue regarding decedent's competency.

¶ 32    On October 18, 2007, decedent transferred his trust assets to defendant through a new trust agreement and drafted a new will. Decedent also gifted the Home Farm to defendant by executing a trustee's deed. Attorney Fleming testified that he spent around 30 to 45 minutes going over the documents with decedent.

¶ 33    Defendant testified she was unaware decedent went to attorney Fleming in October 2007 and drafted various documents. Defendant stated that she only became aware of the 2007 trust and will after the litigation commenced. Furthermore, defendant testified that when she faxed documents in May 2007 to attorney Fleming's office that she did not read the documents or know the contents of the documents.

¶ 34    After plaintiff rested her case, defendant moved for a directed verdict. On April 27, 2018, defendant filed her motion for directed verdict. The court took defendant's motion under advisement. Also, on April 27, 2018, plaintiff filed an affidavit for attorney fees.

¶ 35                    C. Trial Court's Decision

¶ 36    On September 20, 2018, the trial court found defendant unduly influenced the decedent upon consideration of all the evidence, particularly on the credibility of the witnesses. The court first determined plaintiff presented sufficient evidence to show a presumption of undue influence where a fiduciary relationship existed between defendant and decedent after

- 9 -

Alice's death and defendant controlled almost every aspect of decedent's life, including serving as co-trustee of Alice's 2002 trust, decedent's power of attorney, and being involved in all aspects of decedent's life. The court found decedent came to rely on defendant and that decedent placed trust in defendant. Lastly, the court found defendant contacted and communicated with attorney Fleming to further the procurement of decedent's 2007 will and trust. The court declined to find plaintiff sustained her burden in proving that (1) defendant took decedent against his will to defendant's lawyer or (2) that decedent signed the 2007 will and trust because defendant led him to believe that the nursing home would take his farm.

¶ 37      In determining whether a presumption of undue influence arose, the trial court considered the testimony and credibility of several witnesses. The court stated it "was particularly impressed with the testimony presented by members of the Titus family." The court found "the family truly cared about [decedent] and Alice and what happened to the Home Farm." The court however did not find the testimony of defendant at all credible on the events leading up to decedent's 2007 decision to change his will and trust. The court found in May 2007, defendant contacted attorney Fleming's office and faxed documents which were necessary for decedent to give everything to defendant. The court stated that "[defendant's] testimony that she did not realize what was happening is just not believable."

¶ 38      Furthermore, the trial court stated it did not believe that decedent "was orchestrating the contact's with [attorney] Fleming's office as he was in a declining mental state." The court found defendant competent on October 18, 2007, when he created his 2007 will and trust because plaintiff failed to provide enough evidence to the contrary. However, the court stated, "It just does not seem credible to the court that a man who was 90 years of age who was hard of hearing with declining vision and the onset of dementia could provide the

information necessary to change everything in his estate plan that was done in 2002." Rather, the court stated, "[T]he evidence suggests that [defendant] orchestrated and controlled everything, the [c]ourt believes Gene Herren was intricately involved in controlling the situation as it appears that Gene was a savvy business man who probably realized that he would never obtain the Home Farm and decided with his wife and daughter that this was the only way to obtain [decedent's] assets." The court found, "[defendant] was very much a dominant party as there was little that she and her mother and father did not control as part of [decedent's] everyday life upon Alice's passing."

¶ 39     The trial court stated, "It is clear to the [c]ourt despite [defendant's] denial that [defendant] was aware of the October 2007 events. It is clear that [defendant] knew exactly what she was faxing. It is clear that [defendant] with possible assistance from her father was orchestrating these changes through her contacts with [attorney] Fleming's office and was able to set it up so [decedent] basically had to go and sign his name." The court found it interesting that "[decedent] used other attorneys throughout his life (never [attorney] Fleming), but that when he decided to change everything in October 2007 to the benefit of [defendant] he decided to use [attorney] Fleming who coincidentally is Gene Herren's attorney for decades."

¶ 40     The trial court stated that it believed plaintiff's letter inquiring about her mother's estate caused defendant to expedite her plan to have decedent sign over all his assets. Furthermore, the court found it curious that defendant directed Julian, decedent's attorney, to respond to the letter but defendant never notified decedent's attorney that decedent was modifying his estate documents.

¶ 41     The trial court found there existed multiple contacts between defendant and attorney Fleming's office. Specifically, there existed a message in October 2007 where the

receptionist noted that defendant stated decedent "is ready to go." The court found defendant's contact with attorney Fleming's office was consistent with Desherlia's testimony where the court found Desherlia to be very credible that there was a conversation between Gene and defendant about getting decedent to the attorney before he changed his mind. The court stated, "It makes no sense to the court that [decedent] would be soliciting meetings with members of the Titus family in September 2007 for the purchase of the Home Farm when he planned to give everything to [defendant]."

¶ 42 While plaintiff established a presumption of undue influence, the trial court found defendant failed to present enough evidence to rebut the presumption. The court stated, "It would not surprise the [c]ourt that [decedent] was disappointed with [plaintiff] for not coming back for her mother's funeral or that perhaps [decedent] did not have a close relationship with either child." However, the court determined that "although the court could envision a scenario where [decedent] might want to modify his estate plans and change what Hanna and Nathan were to receive, the [c]ourt does not find any believable scenario that would not have been the result of undue influence whereby [decedent] would have completely cut the step-children out of all assets. After all, that would not have been what Alice wanted and [decedent] loved Alice more than life itself." Thus, the court found defendant unduly influenced decedent and invalidated the 2007 will and trust.

¶ 43 The trial court also awarded plaintiff attorney fees. The court declined to award plaintiff punitive damages where the court heard no evidence of complaints about the care defendant provided to decedent. The court held that "[a]ny harm caused by [defendant] would have only been financial and with the court setting aside the events at Perica's office in 2007, the

- 12 -

harm has been minimized.  The court does not believe that justice or the public good require the award of punitive damages in this cause."

¶ 44                                    D. Posttrial Proceedings

¶ 45           For good cause, the trial court extended the time for defendant's motion to reconsider to November 19, 2018.  On October 17, 2018, plaintiff filed a motion to reconsider, alleging the court erred when it failed to award plaintiff (1) $10,079.87 representing the money defendant received where no evidence or accounting showed the money benefited decedent and (2) punitive damages. On November 19, 2018, defendant filed a motion to reconsider, alleging (1) plaintiff failed to prove allegations pled, (2) the theory created by the court after the close of evidence deprived defendant of a fair trial, (3) the presumption of undue influence did not arise during trial, (4) plaintiff's allegations of undue influence at execution failed, (5) the court erroneously shifted the burden of proof to defendant, (6) the court's decision was against the manifest weight of the evidence, (7) the court erred in granting attorney fees, (8) during trial multiple evidentiary errors arose, and (9) defendant's motion for summary judgment and motion for directed verdict should be granted.

¶ 46           On December 17, 2018, the trial court held a hearing on the parties' motions to reconsider.  At the hearing, the court reiterated and clarified multiple points in its order. Specifically, the court stated,

          "I think that after considering the evidence I thought the plaintiff's

          case was fairly strong in [*sic*] that it would have been a more

          difficult call for the court if there had been testimony, and what

          had occurred is that [decedent] had signed over his savings [*sic*]

          account or trust assets, other than the farm, to [defendant] and sold

- 13 -

the farm to the Tituses, or someone else, or modified his trust and will in a manner to where everything didn't go to [defendant]. I put some weight on that because everything leading up to that date in [attorney] Fleming's office suggested that [decedent] had no intention of leaving everything to [defendant]."

¶ 47 The trial court found a presumption of undue influence arose where plaintiff proved all four *prima facie* elements laid out in *DeHart v. DeHart*, 2013 IL 114137, 986 N.E.2d 85. The court addressed all four elements. In regard to the fourth element—defendant preparing the procurement of decedent's 2007 will and trust—the court found that plaintiff failed to prove (1) defendant took decedent against his will to defendant's lawyer or (2) decedent signed the 2007 will and trust because defendant led him to believe that the nursing home would take his farm.

¶ 48 The trial court did however find that plaintiff proved defendant made arrangements with attorney Fleming in order to procure decedent's assets. The court in discussing defendant's contact with attorney Fleming's office prior to October 18, 2007, stated, "Plaintiffs are only able to argue two contacts between defendant and [attorney Fleming's] office. My suspicion is there was maybe a few more. That's not to say two contacts wouldn't be able to take place to be able to take care of getting these documents done, and we do know there was contact between defendant and [attorney] Fleming."

¶ 49 While the trial court determined plaintiff failed to prove decedent was incompetent on October 18, 2007, the court stated, "I have to find undue influence was being exercised at the time of execution. *** I just found that I do not believe in October of 2007 that

- 14 -

[decedent] would have done what he did, absent undue influence, and, like I said, I believe it was strong on the plaintiff's case."

¶ 50    The trial court then found defendant failed to rebut the presumption of undue influence. The court stated, "[D]efendant presented some evidence which at a minimum showed the court that decedent had reason to change his will. Perhaps, he had reason to modify it, but not the way he did it, absent the undue influence." The court found the Titus family's testimony poked holes in defendant's case.

¶ 51    The trial court also addressed defendant's claim that the court came up with a new theory of a conspiracy between defendant and her parents after the close of evidence. The court found no conspiracy with defendant and her parents to obtain decedent's assets; rather, the court addressed Gene's and Patsy's involvement to help show the close relationship defendant and her parents shared. The court made clear it thought defendant was the one involved in all aspects of decedent's life and she was the one who orchestrated and controlled everything relating to decedent.

¶ 52    The trial court found that it had broad discretionary power in awarding attorney fees and punitive damages. The court declined to find that defendant's conduct rose to the level necessary to award punitive damages where defendant took good care of decedent and the court did award plaintiff attorney fees. The court also declined to award plaintiff $10,079.87 where plaintiff failed to present enough evidence to allow the court to determine whether defendant took the money. On December 21, 2018, the court denied plaintiff's motion to reconsider and defendant's motion to reconsider.

¶ 53    This appeal followed.

¶ 54                                II. ANALYSIS

¶ 55        On appeal, defendant argues (1) plaintiff failed to prove allegations of undue influence; (2) plaintiff's proof failed to conform to the pleadings; (3) a presumption of undue influence failed to arise at trial; (4) the trial court erroneously shifted the burden of proof to defendant; (5) the court erred in granting plaintiff attorney fees; (6) the court erred in certain evidentiary rulings; (7) the court erred in creating a new theory after the close of evidence; (8) the court erred in denying defendant's motion for summary judgment, motion for directed verdict, and motion to reconsider; and (9) the court's finding of undue influence was against the manifest weight of the evidence.  Plaintiff agrees with the court's finding of undue influence but cross-appeals arguing the court erred by (1) failing to award $10,079.87 misappropriated by defendant and (2) declining to award plaintiff punitive damages.  We turn first to the issue of undue influence.

¶ 56                              A. Undue Influence

¶ 57        Defendant argues the trial court's finding of undue influence is against the manifest weight of the evidence.  Defendant alleges plaintiff failed to raise a presumption of undue influence where she failed to specifically plead how defendant procured preparation of decedent's 2007 will and trust.

¶ 58                              1. *Standard of Review*

¶ 59        "Undue influence necessary to invalidate a will [or trust] is that influence which prevents the testator from exercising his own free will in the disposition of his estate." *In re Estate of DiMatteo*, 2013 IL App (1st) 122948, ¶ 62, 995 N.E.2d 420.  "Undue influence must be directly connected with the execution of the instrument, operate at the time it was made, and be directed toward procuring the will in favor of a particular party or parties." *Id.*

¶ 60        "What constitutes undue influence cannot be defined by fixed words and will depend upon the circumstances of each case." *In re Estate of Hoover*, 155 Ill. 2d 402, 411, 615 N.E.2d 736, 740 (1993). "The exercise of undue influence may be inferred in cases where the power of another has been so exercised upon the mind of the testator as to have induced him to make a devise or confer a benefit contrary to his deliberate judgment and reason." *Id.* "Proof of undue influence may be wholly circumstantial." *Id.* at 411-12. "The influence may be that of a beneficiary or that of a third party which will be imputed to the beneficiary." *Id.* at 412. We will reverse the finding of undue influence only if it is contrary to the manifest weight of the evidence. *In re Estate of Burren*, 2013 IL App (1st) 120996, ¶ 20, 994 N.E.2d 1022.

¶ 61        In Illinois, a presumption of undue influence arises "where (1) a fiduciary relationship exists between the testator and a person who receives a substantial benefit from the will, (2) the testator is the dependent and the beneficiary the dominant party, (3) the testator reposes trust and confidence in the beneficiary, and (4) the will is prepared by or its preparation procured by such beneficiary." *DeHart*, 2013 IL 114137, ¶ 30.

¶ 62        Once a presumption is established, the defendant then has the burden to rebut it. *Id.* ¶ 29. A presumption does not shift the burden of persuasion; rather, it shifts the burden of production onto the defendant. *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 462, 448 N.E.2d 872, 876-77 (1983). To overcome a presumption of undue influence in a will or trust contest, a fiduciary who benefits from a will or trust must present clear and convincing evidence that the testator freely expressed his own wishes and not the wishes of the fiduciary. See *Estate of Burren*, 2013 IL App (1st) 120996, ¶ 23. "The strength of the presumption and the amount of proof required to overcome it must depend upon the circumstances of each case." *Wunderlich v. Buerger*, 287 Ill. 440, 445, 122 N.E. 827, 829 (1919). If defendant rebuts any one

- 17 -

of the four elements by clear and convincing evidence, the presumption of undue influence disappears. *In re Estate of Henke*, 203 Ill. App. 3d 975, 979-80, 561 N.E.2d 314, 317 (1990).

¶ 63                                    2. *Presumption of Undue Influence*

¶ 64        Here, we agree with the trial court's finding that a presumption of undue influence arose where plaintiff proved the *prima facie* elements laid out in *DeHart*, 2013 IL 114137, ¶ 30. In determining whether a presumption arose, the court considered and weighed the testimony and credibility of several witnesses.

¶ 65        First, the trial court found a fiduciary relationship existed between defendant and decedent in October of 2007. A fiduciary relationship may exist as a matter of law from the relationship of the parties, such as a relationship where trust is reposed on one side and results in superiority and influence on the other side. *In re Estate of Long*, 311 Ill. App. 3d 959, 963, 726 N.E.2d 187, 190 (2000). "A power of attorney gives rise to a general fiduciary relationship between the grantor of the power and the grantee as a matter of law." *In re Estate of Elias*, 408 Ill. App. 3d 301, 319, 946 N.E.2d 1015, 1032 (2011). Here, a fiduciary relationship existed between decedent and defendant after Alice's death where defendant served as decedent's power of attorney, co-trustee of both Alice's and decedent's 2002 trusts, paid bills, provided transportation, meals, and shopping while managing decedent's affairs.

¶ 66        Second, the trial court found defendant acted as the dominant party and decedent as the dependent in October 2007, where defendant controlled almost every aspect of decedent's life. Defendant paid bills, withdrew cash, and handled many matters relating to decedent's 2002 trust. Defendant also provided transportation for shopping and doctor visits, and she conversed with medical providers about decedent's treatment and appointments. Defendant along with her mother provided decedent's meals. Multiple witnesses testified to the installation of a gate on

decedent's property after Alice's death thus resulting in the isolation of decedent from everyone besides defendant and her parents. The court stated that "it was particularly impressed with the testimony presented by the members of the Titus family." The court found "the [Titus] family truly cared about [decedent] and Alice and what happened to the Home Farm."

¶ 67 Third, the trial court found decedent reposed trust and confidence in defendant in October 2007 where defendant acted as co-trustee with decedent as to Alice's trust. Decedent also appointed defendant as his healthcare power of attorney, durable power of attorney, and authorized defendant to control assets of his trust. Furthermore, defendant handled all matters related to decedent's finances, health, and well-being.

¶ 68 Relating to the fourth element—defendant procuring preparation of decedent's 2007 will and trust—the trial court found plaintiff failed to prove (1) defendant took decedent against his will to defendant's lawyer or (2) decedent signed the 2007 will and trust because defendant led him to believe that the nursing home would take his farm. However, the court found that plaintiff did prove that defendant, in May and October 2007, procured the preparation of the changes to decedent's estate plans through her contact with attorney Fleming.

¶ 69 The trial court found in May 2007, defendant contacted attorney Fleming's office and faxed documents pertaining to decedent's 2002 will and trust. The court did not find defendant's testimony to be credible on the events leading up to decedent's 2007 decision to change his will and trust. Specifically, the court stated, "[Defendant's] testimony that she did not realize what was happening is just not believable."

¶ 70 Defendant faxed and contacted attorney Fleming's office in May 2007 and October 2007. On October 1, 2007, defendant left a message with attorney Fleming's office that "[decedent] is ready to go—when can you come to Jerseyville or Alton[?]" However, none of

the messages show any communication between decedent and attorney Fleming. Attorney Fleming failed to recall ever meeting with decedent or talking to decedent on the phone prior to October 18, 2007. The court found the messages to attorney Fleming's office showed defendant set up all arrangements and spoke with attorney Fleming.

¶ 71 The trial court looked to the testimony of multiple witnesses including Desherlia and members of the Titus family. The court found defendant's contact with attorney Fleming's office was consistent with Desherlia's testimony—which the court found to be very credible—where she overheard a conversation between Gene and defendant about getting decedent to the attorney before he changed his mind. The court also found that decedent's love for his wife and decedent's discussions with the Titus family about the disposition of his farm in the fall of 2007 were inconsistent with the events that occurred on October 18, 2007. Furthermore, the court found it curious that decedent used attorney Fleming to create his 2007 will and trust where decedent used other attorneys throughout his life and attorney Fleming was defendant's father's lifelong attorney. We find plaintiff presented sufficient facts to support all four elements necessary to raise a presumption of undue influence.

¶ 72 Defendant disagrees and argues plaintiff failed to establish a presumption of undue influence. Defendant focuses on the fourth element of procurement and argues plaintiff failed to specifically plead procurement. See *In re Estate of Julian*, 227 Ill. App. 3d 369, 376, 592 N.E.2d 39, 44 (1991) ("The mere conclusion that the testator was influenced by the dominant nature of the disproportionate beneficiary is insufficient.").

¶ 73 We find plaintiff alleged procurement by asserting three instances of procurement. Plaintiff alleged that (1) defendant took decedent against his will to defendant's lawyer, (2) decedent signed the 2007 will and trust because defendant led him to believe that the

nursing home would take his farm, and (3) defendant made arrangements with attorney Fleming in preparation to procure decedent's assets in October 2007. Thus, it is clear from the pleadings that plaintiff provided more than just a statement of dominance over decedent.

¶ 74    Defendant further argues plaintiff failed to raise a presumption of undue influence where plaintiff failed to prove all three theories of procurement. Defendant relies on *Anthony v. Anthony*, 20 Ill. 2d 584, 587, 170 N.E.2d 603, 604 (1960), *In re Estate of Letsche*, 73 Ill. App. 3d 643, 646-47, 392 N.E.2d 612, 614 (1979), and *In re Estate of Walls*, 203 Ill. App. 3d 574, 581, 561 N.E.2d 344, 348 (1990), to support her argument. In *Anthony*, the supreme court failed to find undue influence where the only facts shown to connect the defendant with the making of the will was that she transported the decedent to the attorney's office and was present in the office when the will was executed. *Anthony*, 20 Ill. 2d at 587. In *Letsche*, the reviewing court found the defendant's actions failed to raise a presumption of undue influence where the defendant was not present when the will was executed and, at the attorney's request, the defendant merely read to him over the phone the decedent's plans for a revised will. *Letsche*, 73 Ill. App. 3d 646-47. In *Walls*, our court found against procurement where the evidence showed the decedent initiated the idea of changing his will, the defendant was only present at the attorney's office once while the decedent conducted another matter, and no evidence showed the decedent ever discussed his will with the defendant. *Walls*, 203 Ill. App. 3d at 581. We find these cases distinguishable.

¶ 75    While the trial court found plaintiff failed to prove two of her three theories of procurement, the court found defendant's arrangement with attorney Fleming sufficient to prove defendant procured the preparation of decedent's 2007 will and trust. Specifically, defendant's contacts with attorney Fleming's office in May 2007 and October 2007, the testimony of

multiple witnesses regarding events in the fall of 2007, and defendant's isolation of decedent showed defendant took steps to procure decedent's assets.

¶ 76 Defendant in her reply brief argues plaintiff relied on a fax occurring ten months after decedent executed his October 2007 will and trust to support her argument of procurement. We disagree. While the record shows defendant contacted attorney Fleming's office after the execution of decedent's October 2007 will and trust, the trial court did not rely on those communications to find procurement on the part of defendant. The court relied on the evidence present at the time of execution on October 18, 2007. Since the court found all four elements necessary to raise a presumption of undue influence, the burden shifted to defendant to rebut the presumption of undue influence.

¶ 77 3. *Rebuttal of Presumption*

¶ 78 The trial court found that defendant failed to present evidence sufficient to rebut the presumption of undue influence. Defendant argues the court improperly shifted the burden of proof where the court stated, "The burden then shifts to [defendant] to show that she did not unduly influence [decedent]. The court finds that [defendant] has failed to meet this burden." We find the court did not improperly shift the burden of persuasion; rather, it shifted the burden of production onto defendant. When considering allegations of undue influence, "once the presumption is established, the defendant would then have the burden to rebut it." *DeHart*, 2013 IL 114137, ¶ 29. After reviewing the court's order, we find it obvious the court understood that it had to determine whether plaintiff's evidence raised a presumption of undue influence, and if it did, the court further understood it then had to determine if defendant rebutted that presumption. Thus, based on the record, we find the court did not improperly shift the burden of proof.

¶ 79　　　　Last, defendant argues she presented sufficient evidence to rebut the presumption of undue influence. The only evidence defendant presented to rebut the presumption of undue influence was the lack of a relationship between decedent and plaintiff. Furthermore, Patsy testified she witnessed decedent voice his displeasure with his stepchildren. However, multiple other witnesses testified to the contrary. While the trial court stated that it "could envision a scenario where [decedent] might want to modify his estate plans and change what Hanna and Nathan were to receive," the court found completely unbelievable, absent undue influence, any scenario where decedent would choose to completely disinherit his stepchildren. Ultimately, the court determined the evidence offered by defendant lacked the strength to rebut the presumption of undue influence established by plaintiff. Therefore, we find the court's finding of undue influence was not against the manifest weight of the evidence. Given our conclusion on the undue influence issue, we also find the court did not err in denying defendant's motion for summary judgment, motion for directed verdict, and motion to reconsider.

¶ 80　　　　　　　　　　　　　B. Evidentiary Errors

¶ 81　　　　Next defendant argues the trial court erred when it incorrectly ruled on 11 evidentiary matters. Defendant asserts the evidentiary errors in isolation may not have prejudiced the outcome but the cumulative effect denied defendant a fair trial. Whether the trial court erred in certain evidentiary rulings is reviewed for an abuse of discretion. *Hoover*, 155 Ill. 2d at 420.

¶ 82　　　　We first note that defendant failed to comply with Illinois Supreme Court Rule 341 (eff. May 25, 2018) as to ten of the evidentiary errors alleged in defendant's opening brief. Rule 341 governs the form and content of appellate court briefs and, among other things, requires an appellant's brief contain an "Argument" section, "which shall contain the contentions

of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). Points that are not argued in an appellant's brief are forfeited. *Id.*

¶ 83 Here, defendant violated Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018) where she failed to cite any authority or put forth argument to support her assertion that (1) the court allowed improper impeachment, (2) the court allowed irrelevant evidence, (3) Dr. Johnson's evidence deposition should have been excluded, (4) the court allowed lay opinions as to medical conditions, (5) the court prevented defendant from testifying as to observations of decedent around plaintiff, (6) the court sustained objections against statements by a party-opponent to the matter, (7) the court allowed plaintiff to avoid the Dead Man's Act, (8) the court allowed plaintiff to expand the scope of direct on redirect, (9) the court allowed speculative questions, and (10) the court sustained objections by plaintiff to events not invoking the Dead Man's Act. We find defendant's failure to cite authority forfeited these ten issues on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018).

¶ 84 Last, defendant argues the trial court erred in allowing all UBS financial documents and decedent's durable power of attorney to be admitted without authentication and foundation as to what the documents were. Defendant alleges plaintiff attempted to lay foundation for each document through defendant who lacked the necessary knowledge to lay a foundation for the documents. See *People v. Virgin*, 302 Ill. App. 3d 438, 449-50, 707 N.E.2d 97, 105 (1998) (For a proper foundation for the admission of business records, "[i]t is necessary that someone familiar with the business and its mode of operation testify at trial as to the manner in which the record was prepared.").

¶ 85　　　　The trial court admitted the documents and allowed plaintiff to submit an affidavit authenticating the UBS documents. The court accepted the affidavit over defendant's objection. Defendant argues she objected to all these documents and maintained her objections though the entire trial and during the close of evidence. Moreover, defendant argues the court used these documents in finding a presumption of undue influence, which unfairly prejudiced defendant.

¶ 86　　　　We find the trial court did not err by admitting the UBS documents, accompanied by an affidavit of authentication, in compliance with Illinois Rule of Evidence 902(11) (eff. Jan. 1, 2011) (pertaining to certified records of regularly conducted activity). Regarding decedent's durable power of attorney, no affidavit was submitted authenticating the document nor did anyone offer testimony establishing the document's authenticity. Assuming *arguendo* the court erred by admitting the durable power of attorney, we find the error harmless where the court analyzed all the evidence and specifically noted its plan to determine the proper weight to be given to the documents. The court's error in admitting business records without proper foundation will not be overturned if the error was harmless. *Benzakry v. Patel*, 2017 IL App (3d) 160162, ¶ 43, 77 N.E.3d 1116.

¶ 87　　　　While the trial court considered decedent's durable power of attorney, the court also considered the testimony of the witnesses at trial, defendant's contacts with attorney Fleming's office in 2007, and defendant's exertion of control over virtually every aspect of decedent's life from his finances to his care. Thus, allowing the durable power of attorney in at trial failed to prejudice defendant where the evidence overwhelmingly established defendant's undue influence over decedent.

¶ 88　　　　　　　　　　　　　C. New Theory

¶ 89    Defendant next argues the trial court created a new theory after the close of evidence that denied defendant the opportunity to defend the case.  Defendant alleges the court asserted a civil conspiracy theory, but that plaintiff never pled or argued a theory of conspiracy.

¶ 90    "In order to state a claim of civil conspiracy, a plaintiff must plead a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means."  *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 23, 694 N.E.2d 565, 571 (1998).

¶ 91    The trial court in its September 2018 order stated, "It is not clear to the court whether [defendant] created this plan or whether [defendant's] parents were instrumental in convincing or manipulating [decedent] to sign over all assets to her.  Even though the evidence suggests that [defendant] orchestrated and controlled everything, the court believes Gene Herren [*sic*] was intricately involved in controlling the situation as it appears that Gene was a savvy business man who probably realized that he would never obtain the Home Farm and decided with his wife and daughter that this was the only way to obtain [decedent's] assets."

¶ 92    The trial court, in ruling on the motions to reconsider, addressed defendant's claim that the court created a new theory of conspiracy after the close of evidence.  The court stated it addressed Gene's and Patsy's involvement to help show the close relationship that existed between defendant and her parents.  The court made it clear it did not think a conspiracy arose between defendant and her parents to obtain decedent's assets in October 2007.  Rather, the court found defendant was the one involved in all aspects of decedent's life and that she was the one who orchestrated and controlled everything related to decedent.

¶ 93    We find the trial court never asserted a new theory of civil conspiracy but rather analyzed the relationship between defendant and her parents in determining whether a

presumption of undue influence arose. Thus, the court did not deprive defendant of a fair trial where defendant had ample opportunity to present her case and offer evidence on rebuttal.

¶ 94                                    D. Punitive Damages and Attorney Fees

¶ 95        Defendant argues the trial court erred by granting plaintiff attorney fees. Plaintiff cross-appeals arguing the trial court erred by (1) declining to award plaintiff punitive damages and (2) failing to award $10,079.87 misappropriated by defendant.

¶ 96        Defendant argues (1) the trial court erred in awarding attorney fees to plaintiff where the court declined to impose punitive damages and (2) plaintiff presented no evidence of attorney fees at trial and merely filed a posttrial affidavit of attorney fees.

¶ 97        Defendant alleges attorney fees are only available as an element of punitive damages. See *In re Estate of Talty*, 376 Ill. App. 3d 1082, 1094, 877 N.E.2d 1195, 1207 (2007). Plaintiff disagrees and relies on *Elias*, 408 Ill. App. 3d at 326, to support her argument that the trial court properly granted attorney fees even in the absence of awarding punitive damages. Plaintiff points to the trial court's reliance on its broad discretionary power in awarding attorney fees. Because we find *Elias* distinguishable, we agree with defendant and reverse the trial court's imposition of attorney fees.

¶ 98        The court in *Elias* stated, "Attorney fees for an executor can be assessed against a party in a probate proceeding based either on equitable contribution or as punitive damages where there was willful or outrageous conduct due to evil motive or a reckless indifference to the rights of others." *Id.* Absent in the case before us is any controversy about awarding attorney fees to defendant as an executor. Moreover, in discussing the two distinct bases for awarding attorney fees, the *Elias* court discussed awarding attorney fees as part of punitive damages where the court finds willful or outrageous conduct, or as an equitable contribution where there exists

- 27 -

statutory authority for imposition of attorney fees. *Id.* Thus, before the court can exercise its discretion, there must be some statutory authority allowing attorney fees or a finding supporting the imposition of punitive damages.

¶ 99 Following the hearing on defendant's motion to reconsider, the trial court acknowledged defendant's position that attorney fees must be part of a punitive damages award. However, the court declined to change its position and again found that, where defendant took good care of decedent, defendant's conduct failed to rise to the level necessary to merit punitive damages. Given the trial courts finding regarding punitive damages and the absence of any statutory authority for the imposition of attorney fees, we reverse the court's imposition of attorney fees.

¶ 100 Plaintiff also argues the trial court's decision to not award plaintiff additional funds misappropriated by defendant was against the manifest weight of the evidence. Specifically, plaintiff alleges defendant took money from Alice's and decedent's trust accounts with UBS in the amount of $10,079.87.

¶ 101 The factual determination of the trial court prevails on appeal unless it is contrary to the manifest weight of the evidence. *In re Estate of Jones*, 159 Ill. App. 3d 377, 382, 512 N.E.2d 1050, 1053 (1987).

¶ 102 At trial defendant testified she cashed checks for decedent and that half went into decedent's savings and the other half came back to decedent in cash. Defendant also testified she never compensated herself after she cashed checks for decedent. When considering the evidence presented, the trial court found plaintiff failed to prove that defendant misappropriated $10,079.87. Therefore, we find the trial court's decision not to award plaintiff $10,079.87 in additional funds was not against the manifest weight of the evidence.

¶ 103                        III. CONCLUSION

¶ 104        For the foregoing reasons, we affirm the trial court's judgment in part and reverse

in part.  We thank the trial court for its thorough and detailed order in this matter, which we

found extremely helpful.

¶ 105        Affirmed in part, reversed in part.