2026 IL App (1st) 251260-U

FOURTH DIVISION
Order filed: June 18, 2026

No. 1-25-1260

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | |
|---|---|
| *In re* ESTATE OF ERNEST DAVID LEVERT, JR., an alleged Disabled Adult, now Deceased. | ) Appeal from the<br>) Circuit Court of<br>) Cook County. |
| (Ivory Levert, | ) |
| | ) |
| Cross-Petitioner-Appellant, | ) |
| | ) No. 2024 P 007613 |
| v. | ) |
| | ) |
| Rhonda Hagey-Levert, | ) Honorable |
| | ) Jesse Outlaw, |
| Petitioner-Appellee.) | ) Judge, presiding. |

JUSTICE QUISH delivered the judgment of the court.
Presiding Justice Navarro and Justice Ocasio concurred in the judgment.
Justice Ocasio also specially concurred.

**ORDER**

¶ 1    *Held*: Circuit court's order requiring wife of now-deceased disabled adult ward to reimburse the ward's former temporary guardian using funds in a GoFundMe campaign is reversed because the circuit court had no jurisdiction over the GoFundMe campaign funds.

¶ 2    Cross-petitioner Ivory Levert ("Ivory") appeals from the order of the circuit court of Cook County granting the petition for reimbursement filed by petitioner Dr. Rhonda Hagey-Levert ("Rhonda") in this adult guardianship estate. The petition sought reimbursement for medical and other expenses that Rhonda incurred after her adult son, Ernest David Levert Jr. ("Ernest"), suffered a severe stroke.  Rhonda requested that the reimbursement come from a GoFundMe campaign opened by Ivory, Ernest's wife. The court agreed. On appeal, Ivory argues that the circuit court lacked authority to compel her to reimburse Rhonda from the GoFundMe campaign funds. For the following reasons, we vacate that portion of the circuit court's May 29, 2025 order and remand for further proceedings.

¶ 3    Ernest suffered a severe stroke at the age of 33 in April 2024. In the months following, Ernest required intensive medical care and multiple surgeries. Prior to his stroke, he lived in Columbus, Ohio with his then-pregnant wife, Ivory, and their young child. In May 2024, Ernest's medical needs required him to be transferred to Chicago for treatment. Rhonda and Ernest Levert Sr. ("Ernest Sr."), his parents, moved from Texas to Illinois to help facilitate Ernest's care and contributed to expenses relating to Ernest's medical care, transportation, and housing in Chicago.

¶ 4    In late October 2024, Rhonda filed a petition for appointment of a guardian of a person with a disability and a separate petition to appoint a temporary guardian for Ernest in the circuit court of Cook County. The petition for appointment of a guardian asserted that Ernest lacked capacity to communicate and make decisions regarding his care and was unable to manage his estate and financial affairs, and asked that Rhonda be appointed guardian of Ernest's estate and person. It listed the value of Ernest's personal assets as "TBD" and his real assets as "$0." The petition for appointment of a temporary guardian added that Ernest was scheduled for surgery on

October 31, 2024, and that temporary guardianship was needed to consent to medical treatment on Ernest's behalf.

¶ 5     The circuit court appointed Rhonda as temporary guardian of Ernest's estate and person on October 31, 2024. The order granted Rhonda authority to (1) act as a surrogate for Ernest pursuant to the Illinois Health Care Surrogate Act; (2) consent to and contract for placement at a rehabilitation facility; (3) execute releases and consents on Ernest's behalf to access medical records and information; and (4) "to investigate, collect, and safeguard any and all personal belongings and assets," including "the authority to collect and close any and all bank accounts held in [Ernest's] name."

¶ 6     In November 2024, Ivory filed an appearance and a cross-petition for appointment as guardian of Ernest's estate and person. Ivory also filed an emergency motion to appoint a guardian *ad litem* and to amend the October 31 order to appoint her as temporary guardian, not Rhonda.  On November 22, Ivory withdrew her emergency motion. The circuit court appointed a guardian *ad litem*, extended Rhonda's temporary guardianship and ordered the parties to submit a care plan for Ernest.

¶ 7     Ernest died on January 8, 2025 due to complications from his stroke. Thereafter, the circuit court discharged the guardian *ad litem* and set the matter for Rhonda to file a petition to spread his death of record, a report in lieu of a final accounting and any fee petitions.

¶ 8     Rhonda then filed a petition for reimbursement seeking $119,442.93 for expenses she incurred for Ernest's caregiving, transportation, housing, parking and medical care from June to December 2024. The petition stated that she was "unable to marshal any assets from [Ernest's] estate" to reimburse her for those expenses "[d]ue to Ivory's lack of cooperation." The petition

asserted that Ernest had two bank accounts he jointly owned with Ivory that held approximately $45,000, as well as a GoFundMe campaign opened by Ivory with a balance of $97,187. The only authority cited in the petition was section 15 of the Rights of Married Persons Act, for the proposition that Ivory, as Ernest's wife, was responsible for Ernest's medical bills and expenses. See 750 ILCS 65/15 (West 2024). Rhonda asked the court to approve her petition for reimbursement and order Ivory to reimburse her $119,442.93 for expenses paid on behalf of Ernest.

¶ 9     She attached a screen shot of the GoFundMe campaign page taken on February 21, 2025. The page was entitled "Support Ernest Levert Jr's Healing Journey" and stated that donations would help cover medical bills, medical equipment and supplies, a 24-hour home health aide, wheelchair accessible home renovations, wheelchair accessible transportation expenses, and "[a]ny additional unexpected family expenses." The page noted that "Ivory Levert is organizing this fundraiser" and that the campaign was created on August 22, 2024. Rhonda's petition also included a spreadsheet documenting expenses Rhonda paid while facilitating Ernest's medical care from June through December 2024. The spreadsheet referenced statements, invoices, and receipts which may have been provided to the circuit court as exhibits, but are not part of the record on appeal.

¶ 10    Rhonda also filed a report in lieu of final accounting. The report stated that Rhonda opened a guardianship account, but the account was funded with her own assets because she was unable to marshal any assets belonging to Ernest into the guardianship estate. She reported that no assets were in Ernest's estate, but listed what she "believe[d] Ernest Jr.'s assets to be." Among those assets was a "GoFundMe Campaign" with a listed value of $97,187, and a joint bank account

owned by Ernest and Ivory valued at $44,957. She listed other "believe[d]" assets to include Ernest's pension and life insurance policy, the location and values of which were "under investigation." She listed "Social Security benefits for Ernest" but noted that the "application [was] unable to be submitted." Rhonda also listed Ivory's monthly income in 2024 as $4,000 per month, but noted that was "not a guardianship asset." The report asserted that, on November 14, 2024, nearly all of the funds in the joint bank account were withdrawn by Ivory. Rhonda asked the court to accept and approve the report, discharge her as temporary guardian, cancel the surety bond and close the estate.

¶ 11    The circuit court held a hearing on March 6, 2025 regarding Rhonda's report in lieu of accounting and petition for reimbursement. The court entered and continued the report, "the Court having approved the Report in Lieu of Final Accounting, but counsel [for Ivory] having later objected that the GoFundMe campaign created for" Ernest "(which is listed as an asset of [Ernest] in the Report) is not a part of the Estate." The court vacated its ruling approving the report and allowed Ivory to file a written response to both the report and petition for reimbursement.  Rhonda also made an oral motion to freeze the GoFundMe campaign funds while the parties briefed the petition for reimbursement, and the court heard arguments on whether it had jurisdiction over that campaign. Rhonda asserted that the funds in the campaign "were raised for the benefit of Ernest" and the description on the GoFundMe page included the types of expenses that she incurred on Ernest's behalf. Ivory argued that the funds were not intended only for medical expenses and but also for Ernest's family, the court never approved the expenses sought by Rhonda and the court had no jurisdiction over the GoFundMe campaign funds as they were not part of the guardianship

estate. The court stated: "I just don't think I have jurisdiction with regard to freezing that account… It was not a part of the estate, so … I just don't see how I can make that leap."

¶ 12   Ivory filed a response to the report in lieu of accounting in which she agreed that no assets were marshaled into Ernest's guardianship estate and stated that "any assets that [Ernest] owned or maintained an interest in at the time of his death have either passed to any legal co-owners and or his heirs at law." Ivory's response to the petition for reimbursement argued that Rhonda did not seek leave of court to make any decision related to the care or treatment of Ernest and did not ask the court to approve any expenses. She also argued that, because Ernest had died, there was no guardianship estate from which the court could order reimbursement and there was no basis in law for such a claim against a decedent's estate.

¶ 13   In her written motion to freeze the GoFundMe campaign funds, Rhonda acknowledged Ivory's objection to including the GoFundMe funds as an asset of the estate and noted that "[b]ecause there is a dispute as to whether the GoFundMe campaign is an asset of the estate, the dispute should be resolved by this Court before Ivory is authorized to access the funds from the GoFundMe account for *her* personal use." In response, Ivory argued that the court lost jurisdiction over the guardianship estate once Ernest died and lacked authority over the GoFundMe campaign funds because they were never part of the estate. The record does not contain a ruling on this motion.

¶ 14   After hearing additional argument, on May 29, 2025, the circuit court entered an order approving the report in lieu of accounting, discharging Rhonda as temporary guardian and closing the estate. In paragraph 2 of the order, the court granted the petition for reimbursement and directed Ivory to reimburse Rhonda "the sum of $119,442.93 for expenses paid on behalf of Ernest Levert

Jr., said funds to be paid from the GoFundMe campaign created for Ernest Levert Jr." During its oral ruling, the court stated that it felt it had "to be equitable in terms of how I decide this" because Rhonda used her own money for Ernest's care. The court found that Rhonda contributed to Ernest's medical and related expenses and stated it was "concerned" about Ivory's action of opening the GoFundMe campaign but failing to contribute to those expenses. The court concluded that Rhonda was entitled to reimbursement. Upon a request for clarification from Rhonda's counsel, the court agreed that it was "directing the reimbursement come from the GoFundMe account." Ivory now appeals.

¶ 15 The Probate Act allows the court to adjudge a person to be a person with a disability and in that situation, appoint a guardian to manage the estate and person of that individual. 755 ILCS 5/11a-3(a) (West 2024). A court may also appoint a temporary guardian "upon a showing of the necessity therefor for the immediate welfare and protection of the alleged person with a disability." 755 ILCS 5/11a-4(a) (West 2024). "The appointment of a guardian creates the relation of trustee and beneficiary between the guardian and the ward. The estate becomes a trust fund for the ward's support. [Citation.] The guardian only acts as the hand of the court and is at all times subject to the court's direction in the manner in which the guardian provides for the care and support of the disabled person." *In re Estate of Wellman*, 174 Ill. 2d 335, 347 (1996).

¶ 16 A guardian is entitled to "reasonable compensation" for his or her services, which is to be paid from the estate of the ward. 755 ILCS 5/27-1 (West 2024). A guardian may "petition the court for an order directing the guardian of the estate to pay an amount periodically for the provision of the services specified by the court order." 755 ILCS 5/11a-17(a) (West 2024). The guardian need not obtain a court order to pay for necessities of the ward, but "[t]he guardian should usually

petition the court for permission to make large expenditures; otherwise, the guardian performs the acts at his own risk." *In re Estate of Berger*, 166 Ill. App. 3d 1045, 1056 (1987). The guardian may not be reimbursed from funds that are not part of the estate of the disabled person. *In re Estate of McInerny*, 289 Ill. App. 3d 589, 597 (1997).

¶ 17 As the issue raised on appeal concerns the scope of the court's authority under the Probate Act, our review is *de novo*. See *In re Estate of Pellico*, 394 Ill. App. 3d 1052, 1067 (2009) (citing *Alvarez v. Pappas*, 229 Ill. 2d 217, 235 (2008)).

¶ 18 The Probate Act has multiple provisions that govern the guardian's management of the ward's estate. First, the guardian is required to "manage the estate frugally" and apply assets of the estate towards the best interest of the ward. 755 ILCS 5/11a-18 (West 2024). Second, the guardian is required to file an accounting of assets of the estate. 755 ILCS 5/24-11 (West 2024). Third, the guardian may file a citation to discover assets of the ward's estate which are believed to be in the possession of another. 755 ILCS 5/16-1 (West 2024).

¶ 19 Ivory argues that the GoFundMe campaign funds were never part of the guardianship estate and that the circuit court lacked authority under the Probate Act to compel Ivory to reimburse Rhonda from those funds.

¶ 20 Rhonda first responds that Ivory waived any objection to the inclusion of the GoFundMe campaign funds in Ernest's guardianship estate by failing to object to the report in lieu of accounting which listed those GoFundMe campaign funds. This argument is contradicted by the record. The record reflects that Ivory opposed the inclusion of the GoFundMe campaign funds as part of Ernest's estate at the March 6 hearing and argued that the court lacked jurisdiction over those funds. She then filed a written response to the report in lieu of accounting which pointed out

that Rhonda's own petition confirmed that no assets were marshaled into Ernest's estate and asserted that any of Ernest's assets had transferred to "any legal co-owners and or his heirs at law." The court's March 6, 2025, order specifically recognized Ivory's objection by noting the report in lieu of final accounting was entered and continued, "the Court having approved the Report in Lieu of Final Accounting, but counsel [for Ivory] having later objected that the GoFundMe account" is not part of the estate. Ivory repeatedly argued that the court had no jurisdiction over the GoFundMe campaign funds because they were not part of the guardianship estate. Further, in her written motion to freeze the GoFundMe campaign funds, Rhonda acknowledged Ivory's objection, noting that "[b]ecause there is a dispute as to whether the GoFundMe account is an asset of the estate, the dispute should be resolved by this Court before Ivory is authorized to access the funds from the GoFundMe account for *her* personal use." This is more than sufficient to preserve the argument Ivory raises on appeal, that the circuit court lacked authority over the GoFundMe campaign funds because they were not part of Ernest's estate. We reject Rhonda's argument.

¶ 21 We agree with Ivory that the trial court did not have jurisdiction over the GoFundMe campaign funds. There is no dispute that the campaign funds were possessed by Ivory only, who opened the campaign and managed it. There was no indication that Ernest was involved in or had access to the GoFundMe campaign funds at any time. Rather, the parties appear to agree that Ernest was in no condition to do so. Rhonda took no steps under the Probate Act to bring these GoFundMe campaign funds into Ernest's guardianship estate or within the guardianship court's jurisdiction. Since the campaign funds were owned by Ivory, Rhonda could have followed the citation procedure in section 16-1 of the Probate Act to seek a determination that it was part of Ernest's estate. See *In re Estate of Elias*, 408 Ill. App. 3d 301, 315 (2011). Section 16-1 allows a

guardian of the estate to issue a citation to discover assets of the ward which are in the possession of another. 755 ILCS 5/16-1 (West 2024). The purpose of a citation proceeding is "to obtain the return of personal property belonging to the estate but in the possession of, or being concealed by, others." *In re Estate of Elias*, 408 Ill. App. 3d at 315. The representative of the estate must establish a *prima facie* case that the property at issue belongs to the estate of the ward or the decedent, then the burden shifts to the citation respondent to prove their right to possession by clear and convincing evidence. *Id.* Rhonda did not follow this procedure.

¶ 22    Rather, Rhonda argues that the circuit court had personal jurisdiction over Ivory and therefore had authority to order reimbursement from her, regardless of whether the GoFundMe campaign contained sufficient funds. We disagree. "The administration of an estate in the probate court is not an action between or among parties, but is in the nature of a proceeding *in rem*, acting directly on the *res*, which is the estate of the deceased or disabled person." *In re Estate of Denten*, 2012 IL App (2d) 110814, ¶ 42. As such, Rhonda's entitlement to reimbursement for expenses is necessarily tied to the assets in Ernest's estate. See 755 ILCS 5/27-1 (West 2024). If Rhonda sought reimbursement from Ernest's estate, and specifically from the funds in the GoFundMe campaign created and managed by Ivory, she was required to make those funds part of Ernest's guardianship estate and she never did so.

¶ 23    Rhonda also argues, without citation to authority, that the circuit court found that the GoFundMe campaign funds were part of Ernest's estate when it approved her report in lieu of accounting several months after Ernest died. However, in that report, Rhonda admitted that she opened a guardianship account which was funded with her own assets and that "no assets were able to be marshaled into" Ernest's guardianship estate.  Rhonda merely listed a variety of assets

which she "believe[d]" to be Ernest's, including the GoFundMe campaign. She also included "Ivory's monthly income in 2024: $4,000/month" in this list, but expressly acknowledged that this was "not a guardianship asset."

¶ 24 Further, in the report, Rhonda did not ask the court to find that the GoFundMe campaign, or any of the other "believe[d]" assets, were actually part of Ernest's estate. She cites no case law or other authority to support her argument that merely listing a potential asset which was established by someone other than the ward in a report in lieu of accounting was sufficient to bring that asset within the jurisdiction of the guardianship court under the Probate Act, particularly months after the ward died, and we are aware of none.

¶ 25 The circuit court never held that the GoFundMe campaign was part of Ernest's estate in either its written order or oral ruling. The court even questioned its jurisdiction over the campaign funds. Instead, the court "accepted and approved" the report in lieu of final accounting and ordered that Ivory reimburse Rhonda, with "said funds to be paid from the GoFundMe campaign." Thus, this was erroneous.

¶ 26 Although Rhonda argues that the trial court "made the factual determination that the GoFundMe campaign funds were properly included as assets available to reimburse" her because the "funds were raised for Ernest Jr.'s benefit," she cites no court order or transcript where the court so held. Rather, she cites only her own emergency motion to freeze the GoFundMe campaign funds, which does not support her argument.

¶ 27 Rhonda next argues that, since the GoFundMe campaign was linked to a joint bank account held by Ernest and Ivory, Ernest had an ownership interest in these funds. Rhonda did not raise this argument before the circuit court, and thus, it is forfeited. See *Andrews v. Carbon on 26th,*

*LLC*, 2024 IL App (1st) 231369, ¶ 24. Even if this argument was preserved, we would reject it. Rhonda's argument presumes that because the GoFundMe campaign was apparently linked to a joint bank account, Ernest had an ownership interest in the GoFundMe campaign funds and they were part of his estate. However, she cites no authority to suggest that a joint bank account held by a disabled adult automatically becomes part of his guardianship estate, rather than passing to the other joint account holder upon his death. See *Konfrst v. Stehlik*, 2014 IL App (1st) 132113, ¶ 12 ("One of the essential characteristics of a joint tenancy is the right of survivorship or the right of the last surviving joint tenant to take the whole."). Nor does she cite any authority to suggest that an account that is opened and operated by one joint account holder, such as the GoFundMe campaign here, automatically becomes part of the estate of the other joint account holder merely because it is linked to the joint bank account. Therefore, we reject this argument.

¶ 28    Rhonda's remaining arguments rely heavily on principles of equity, asserting that since Ivory created the GoFundMe campaign to cover the same expenses ultimately paid by Rhonda, the circuit court properly ordered that Rhonda be reimbursed from that campaign. However, the Probate Act limits Rhonda's right to reimbursement to expenses from the estate's assets, and Rhonda did not follow the required procedure to obtain a determination that the GoFundMe campaign funds were part of Ernest's estate. 755 ILCS 5/16-1 (West 2024).

¶ 29    Lastly, Rhonda argues that Cook County Local Rules 12.7(b) and 12.9(g) support her argument that the GoFundMe campaign was in Ernest's estate.  However, neither rule provides such support.  Rather, Rule 12.7 provides the procedure for filing a petition to expend funds from a ward's estate in Cook County, which is not at issue in this case as Rhonda never filed such a petition. Cook County Cir. Ct. R. 12.7 (eff. Sept. 3, 1996). That rule also requires the guardian to

list all payments "being received by the ward or by the petitioner." *Id.* Here, Rhonda argues that Ernest did not receive any payments from the GoFundMe campaign funds, making this rule inapplicable. Rule 12.9 governs the contents of inventories to be filed with the court pursuant to 755 ILCS 5/14-1 of the Probate Act. Cook County Cir. Ct. R. 12.9 (eff. Sept. 3, 1996). Rhonda never filed such an inventory in this case and thus, this rule does not apply.

¶ 30    Accordingly, the trial court did not have jurisdiction over the GoFundMe campaign because it was never properly determined to be part of Ernest's guardianship estate. As the trial court's ruling in paragraph 2 of the May 29, 2025 order granting the petition for reimbursement was based solely on its determination that Ivory failed to apply the GoFundMe proceeds towards Ernest's care, we vacate paragraph 2 of that order. The parties do not raise any arguments regarding the other portions of the circuit court's May 29, 2025 order, including the paragraph closing the guardianship estate. Therefore, we will not disturb those portions of the court's order.

¶ 31    For the foregoing reasons, we vacate paragraph 2 of the May 29, 2025 order of the circuit court of Cook County and remand for further proceedings consistent with this order.

¶ 32    Vacated in part and remanded.

¶ 33    JUSTICE OCASIO, specially concurring:

¶ 34    I agree with the outcome of this appeal. I write specially only with respect to the issue in this matter regarding equity.

¶ 35    Fundraising through platforms such as GoFundMe has become a common approach for individuals seeking to cover medical expenses. This method is now so widespread that it has become an important component of the health care system itself, influencing how people access and afford needed treatment. See Isabelle Breier, *Something Is Rotten in the State of Healthcare: Accountability, Affordability, and the Court of Public Opinion*, 25 Duke L. & Tech Rev. 88 (2024).

¶ 36 Many families face challenges in obtaining necessary care for their children, spouse, or loved ones. As a result, a significant number of Americans turn to social media platforms to provide temporary solutions and fill gaps in the health care system. This reliance on online fundraising highlights the absence of affordable and accessible health care options. *Id.*

¶ 37 Notwithstanding, there is a widely held belief that the government should be responsible for ensuring access to affordable health care, possibly by establishing a Right to Healthcare. Advocates argue for centralized and transparent mechanisms of accountability to maintain equity in health care access. Accountability is seen as a vital prerequisite for achieving equity and justice, as it motivates actions that uphold fairness and integrity within the system. *Id.*

¶ 38 Inevitably, the public is addressing a crucial gap in health care by using social media to find affordable solutions. Online fundraising campaigns and platforms are valuable for connecting people with resources that meet their medical needs. While these efforts benefit a few high-profile cases, most individuals are still affected by existing market forces. In short, these tools tend to assist those who are less in need. *Id.*

¶ 39 Generally, a GoFundMe page created for the benefit of a party is not considered part of the ward's estate. However, if the campaign was set up in their name but the funds are managed by a third party or designated beneficiary, those funds typically do not become estate assets. In terms of fair play, the specific circumstances and the intentions stated in the GoFundMe campaign should affect how the funds are treated.

¶ 40 From an equity perspective, funds raised via GoFundMe campaigns for medical costs could be (perhaps should be) considered assets within an individual's estate. Recognizing these campaigns as an estate asset is essential for proper reimbursement, ensuring that any medical expenses paid by a guardian are addressed during the settlement of the estate.

¶ 41       While Judge Jesse Outlaw's focus on equitable factors demonstrates positive intent, such considerations are not permitted under the unique facts here. Nevertheless, acknowledging individual circumstances and employing empathy during legal proceedings may lead to decisions that more effectively address societal welfare and the needs of affected individuals.

¶ 42       Considering the legal constraints, I agree with the reasoning and outcome presented by the majority.